670 P.2d 463

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Thomas Eugene CREECH,
Defendant-Appellant.**

Nos. 14480, 15000.

Supreme Court of Idaho.

May 23, 1983.

Rehearing Denied Sept. 21, 1983.

Rolf Kehne, Boise, Klaus Wiebe, Ada County Public Defenders Office, for defendant-appellant.

David H. Leroy, Jim Jones, Attys. Gen., Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

SHEPARD, Justice.

This is an appeal from a death sentence imposed upon defendant-appellant Thomas Eugene Creech after his plea of guilty to the charge of first degree murder. The cause is before this Court pursuant to the provisions of I.C. § 19–2827, "Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Supreme Court of Idaho," and also upon an appeal filed by Creech, asserting error in certain proceedings, actions and orders of the trial court. We hold that the sentence was validly imposed in conformity with the statutory requirements for the imposition of a death sentence and that the sentence imposed was not in violation of either the Constitution of the State of Idaho or the Constitution of the United States. We affirm.

The following facts regarding the particular offense are disclosed by the record. At the time of the offense here in question, Creech was an inmate of the Idaho State Correctional Institution, serving a life sentence for first degree murder. The victim of this offense, Dale Jensen, had been convicted of car theft and was serving a sentence in the same institution. Jensen had some years earlier sustained a gunshot wound to the head which had necessitated the removal of part of his brain and the placement of a plastic plate in his skull. His speech and motor functions were impaired to some extent. At the time of the offense, both Creech and Jensen were housed in the maximum security tier of the institution.

In the maximum security tier, only one inmate at any one time was ordinarily allowed out of his cell. Creech, however, had been made a janitor and thus, while Creech was performing cleaning duties, he might be out of his cell while another inmate was out of his cell for exercise or shower privileges.

Prior to the offense in question, Creech and Jensen had engaged in argument over television and over Jensen's littering and dirtying the floor, for which Creech, as janitor, was responsible. Apparently the two were not on good terms. Although Creech himself has given more than one version of the murder, it appears that on the day in question, while Jensen was out of his cell, Jensen approached Creech and swung a weapon at him which consisted of a sock containing batteries. Creech took the weapon away from Jensen, who returned to his cell but emerged with a toothbrush to which had been taped a razor blade. When the two men again met, Jensen made some movement toward Creech, who then struck Jensen between the eyes with the battery laden sock, knocking Jensen to the floor. The fight continued, according to Creech's version, with Jensen swinging the razor blade at Creech and Creech hitting Jensen with the battery filled sock. The plate imbedded in Jensen's skull shattered, and blood from Jensen's skull was splashed on the floor and walls. Finally, the sock broke and the batteries fell out, and by that time Jensen was helpless. Creech then commenced kicking Jensen about the throat and head. Sometime later a guard noticed blood, and Jensen was taken to the hospital, where he died the same day. There is some evidence in the record indicating that Creech had been enticed by other inmates to "do Jensen in," but the district judge did not decide or find that the murder had been performed on contract or by plan.

Creech was charged with first degree murder and initially pleaded not guilty. However, later and apparently in response to a letter from Creech, he and his counsel were brought into court to entertain Creech's request to change his plea to guilty. Over the objections of defense counsel, that guilty plea was accepted and the court set a date for a sentencing hearing. Prior to that sentencing hearing, defendant's counsel demanded a jury trial on the issue of aggravating and mitigating factors and also demanded sentencing by a jury. Defense counsel further demanded a

sentencing hearing formal in nature and based solely on the testimony of live witnesses, and he objected to any consideration of hearsay evidence to be used in the formulation of findings on aggravation and mitigation. All of those demands were denied.

At the sentencing hearing, testimony was offered by both the State and the defense, relating to the mental condition of Creech. A psychiatrist, testifying on behalf of the State, offered as his professional opinion that Creech did not suffer from any organic brain syndrome, did not generally depart from reality in his day to day life, and was able to appreciate the wrongfulness of his conduct and conform his acts to the requirements of the law. A psychologist, testifying for the defense, offered as his opinion that Creech, during the fight with Jensen, lost his capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. The psychologist further testified that, in his opinion, Creech suffered from antisocial personality disorder, from a learning deficit, from schizotypal personality disorder, and from a borderline personality disorder. The district court, although not expressly ruling on the sanity of Creech, did find that the defendant was of adequate intelligence and capable of being trained and educated, and further found that the murder was an intentional and calculated act.

Following the conclusion of the sentencing hearing, the district court made its written findings and pronounced sentence of death upon Creech.[1]

The issues presented on this appeal are whether I.C. §§ 19–2515—2516 require a judge's findings in mitigation and aggravation and the imposition of sentence to be based solely on evidence adduced from witnesses personally present and testifying in open court at the sentencing hearing; whether the district judge here committed error in his weighing of the aggravating and mitigating circumstances; and finally, whether the imposition of the death penalty, under our statutory scheme which allows the imposition of the death penalty by a judge without participation or recommendation of jury, is unconstitutional. We answer all three issues in the negative and affirm the holding of the district court below.

At the outset of the sentencing hearing the State requested that the court take judicial notice of the court's entire file and of the presentence report which the district judge had ordered be prepared. Defendant objected and demanded that the entire sentencing record be produced by live witnesses testifying in open court, basing his demand on I.C. §§ 19–2515—2516 and the case law interpreting those statutes. That demand was treated as a motion, which was denied.

We note at the outset that a sentencing decision made solely on the basis of live testimony is not constitutionally mandated. Rule 32(c) of the Federal Rules of Criminal Procedure provides as a matter of course that the probation service of the court shall make a presentence investigation and report to the court before imposition of sentence. The use of the presentence report over defendant's objection has been upheld, despite the contention that the report contained hearsay. *Gregg v. Georgia,* 428 U.S. 153, 203–204, 96 S.Ct. 2909, 2939–2940, 49 L.Ed.2d 859 (1976); *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); *Gregg v. United States,* 394 U.S.

---

1. The district judge executed a written document which imposed the death sentence upon Creech. That document was served upon Creech and his counsel. I.C. § 19–2503 and I.C.R. 43(a) require sentence to be pronounced in open court with a defendant and his counsel being present. The district judge did not conform with those requirements. This Court, therefore, by order of the 24th day of February, 1983, vacated said sentence of death and remanded the cause to the district court for the imposition of such sentence as the district judge might find just and appropriate to be imposed upon Creech in open court with Creech and his counsel present. Consistent with that order of remand, the district judge convened the court on the 17th day of March, 1983 and in the presence of Creech and his counsel, imposed the death penalty upon Creech. The execution of that death penalty was stayed pending these proceedings before this Court.

489, 89 S.Ct. 1134, 22 L.Ed.2d 442 (1969); *State v. Johnson,* 101 Idaho 581, 618 P.2d 759 (1980); *United States v. Ferreboeuf,* 632 F.2d 832 (9th Cir.1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 368 (1981); *Gelfuso v. Bell,* 590 F.2d 754 (9th Cir.1978). This Court has held that the trial judge has broad discretion in deciding what evidence is admissible at the sentencing hearing, *State v. Johnson, supra,* and that the rules of evidence do not apply to the sentencing process, *State v. Johnson, supra; State v. Tucker,* 97 Idaho 4, 539 P.2d 556 (1975). All of the above holdings comport with the constitutional mandate "that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, at 55, 58 S.Ct. 59, at 60, 82 L.Ed. 43 (1937). *Accord Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Williams v. Oklahoma,* 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959); *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). We further note that the United States Supreme Court has in several instances set aside a death sentence, where the Court deemed that the circumstances under which the sentence was imposed did not allow the proper in-depth consideration of the particular circumstances of both the offender and the offense involved. *Enmund v. Florida, supra; Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Roberts v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Winston v. United States,* 172 U.S. 303, 19 S.Ct. 212, 43 L.Ed. 456 (1899). *See also, Jurek v. Texas,* 428 U.S. 262, 271–273, 96 S.Ct. 2950, 2956–2957, 49 L.Ed.2d 929 (1976).

Thus, the argument of appellant that the matters which may be considered at a sentencing hearing must be limited to testimony adduced from witnesses there present must find its foundation, if any, in interpretation of the language of I.C. §§ 19–2515–

2516. I.C. § 19–2515 provides in pertinent part:

"(a) After a plea or verdict of guilty, where a discretion is conferred upon the court as to the extent of the punishment, the court, upon the oral or written suggestion of either party that there are circumstances which may be properly taken into view either in aggravation or mitigation of the punishment, may, in its discretion, hear the same *summarily,* at a specified time, and upon such notice to the adverse party as it may direct.

\* \* \* \* \* \*

"(c) In all cases in which the death penalty may be imposed, *the court shall, after conviction, order a presentence investigation to be conducted according to such procedures as are prescribed by law* and shall thereafter convene a sentencing hearing for the purpose of hearing all relevant evidence and arguments of counsel in aggravation and mitigation of the offense. At such hearing, the state and the defendant shall be entitled to present all relevant evidence in aggravation and mitigation ... Evidence admitted at trial shall be considered and need not be repeated at the sentencing hearing. Evidence offered at trial but not admitted may be repeated or amplified if necessary to complete the record." (Emphasis added.)

I.C. § 19–2516 provides:

"19–2516. Inquiry into circumstances—Examination of witnesses.—*The circumstances must be presented by the testimony of witnesses examined in open court,* except that when a witness is so sick or infirm as to be unable to attend, his deposition may be taken by a magistrate of the county, out of court, upon such notice to the adverse party as the court may direct. *No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court, or a judge thereof, in aggravation or mitigation of the punishment, except as provided in this and the preceding section."* (Emphasis added.)

Here the district court accepted a presentence report compiled by a probation officer which included recitations of prior murder convictions, pending charges of first degree murder, other felonies of which Creech had been charged or convicted, the transcript from a prior trial in which Creech was convicted of first degree murder, reports of psychiatric interviews, letters from Creech, and the manuscript of an autobiographical paper written by Creech, all of which material was considered by the sentencing judge in the instant case.

Appellant asserts that any reasonable interpretation of I.C. § 19–2516 mandates that only oral testimony is to be admitted and considered in a sentencing hearing and hence the admission and consideration of the written presentence report was error, particularly where as here appellant had demanded that the hearing be limited to live testimony.

Appellant's assertion regarding the requirements of I.C. § 19–2516 has been considered and rejected by this Court in the recent case of *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981). In *Osborn* it was held that the statute does not displace or exclude the discretion otherwise granted to the state as to the procedure of presenting evidence of aggravating circumstances at the sentencing hearing. There the Court stated:

> "The last sentence of I.C. § 19–2516 makes it clear that we are to treat both sections as together setting forth the procedure to be followed in such hearings. The statute provides that evidence previously presented at trial need not be repeated and indeed may be amplified if desired. The parties are 'entitled to present all [other] relevant evidence' they desire. The manifest intent is to place as much possible relevant information as can be provided before the sentencing court. This also serves to provide this court with as much information and as complete a record as possible for appellate review." *Id.*, 102 Idaho at 411–412, 631 P.2d 193–194 (brackets in original).

In *Osborn* it was noted that the "unreasoning adherence to the formal requirements [of I.C. § 19–2516] would not materially add to the achievement of statutory objectives" and held that the admission of the presentence report was not error. *Id.*, 102 Idaho at 413, 631 P.2d 195.

 Under the established rules of statutory construction, we are required to construe the language of I.C. § 19–2515 as being consistent with the language of I.C. § 19–2516, if such construction is at all possible. As we explained in *Union Pacific R. Co. v. Board of Tax Appeals*, 103 Idaho 808, 654 P.2d 901, 904 (1982):

> "Statutes which are *in pari materia* are to be construed together to the end that legislative intent will be effected. [Citations omitted.] As stated in *Meyers v. City of Idaho Falls*, 52 Idaho 81, 89–90, 11 P.2d 626, 629 (1932):
>
>> 'The rule that statutes *in pari materia* are to be construed together means that each legislative act is to be interpreted with other acts relating to the same matter or subject. Statutes are *in pari materia* when they relate to the same subject. Such statutes are taken together and construed as one system, and the object is to carry into effect the intention. It is to be inferred that a code of statutes relating to one subject was governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions. For the purpose of learning the intention, all statutes relating to the same subject are to be compared, and so far as still in force brought into harmony by interpretation.' (Citations omitted.)"

Since both statutes deal with the same subject matter, *i.e.*, sentencing procedures, we are enjoined to compare and harmonize them.

 I.C. § 19–2515(c) clearly requires that, "[i]n all cases in which the death penalty may be imposed, the court *shall*, after conviction, order a presentence investigation to be conducted according to such procedures as are prescribed by law." Hence,

no discretion exists in the court, other than to order the conducting of a presentence investigation. I.C. § 20–220 sets out the scope of such investigation, requires a written report, and mandates:

"The parole and probation officer shall inquire into the circumstances of the offense, criminal record, social history and present condition of the defendant. Whenever practicable, such investigation shall include a physical and mental examination of the defendant."

A logical extension of appellant's argument would require an investigation to be completed, a written report to be submitted, but upon the demand of the defendant, the court to refrain from reading the report. Such a result would be, of course, anomalous and unnecessary. We hold that the closing language of I.C. § 19–2516 clearly and unambiguously provides an exception to the otherwise required oral testimony and that those authorizations of I.C. § 19–2515 fall within the purview of the intended exception.

Appellant argues that interpreting the presentence investigation requirements of I.C. § 19–2515 as an exception to the live witness requirement of I.C. § 19–2516 renders the live witness requirement a nullity. As noted above, we do not find the two statutes to be irreconcilable because of the exception language, but in any event, if the provisions of the two statutes could not be harmonized, then the provisions of I.C. § 19–2516 would be construed to be superseded, since I.C. § 19–2515 is the later enacted statute. *Mickelsen v. City of Rexburg,* 101 Idaho 305, 612 P.2d 542 (1980).

■ As stated in *State v. Yoelin,* 94 Idaho 791, 794, 498 P.2d 1264, 1267 (1972), the court is free to consider the results of the prehearing investigation if the reliability of the information contained in the report is insured by certain protections, *i.e.,*

"(1) that the defendant be afforded a full opportunity to present favorable evidence; (2) that the defendant be afforded a reasonable opportunity to examine all the materials contained in the pre-sentence report; (3) that the defendant be afforded a full opportunity to explain and rebut adverse evidence."

*Accord State v. Johnson,* 101 Idaho 581, 618 P.2d 759 (1980), citing *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *State v. Ballard,* 93 Idaho 355, 461 P.2d 250 (1969). Here there is no contention that the defendant was not afforded those protections, and the defendant has at no point, either here or below, challenged the truth of any of the material contained in the presentence report.

■ We hold that the court's admission of and consideration of the presentence report was not error.

■ Appellant next asserts that the district court committed reversible error in its finding of aggravating and mitigating circumstances. He asserts that the aggravating circumstances are unsupported in the record; that the court wrongly included in its weighing process non-statutory aggravating circumstances; that the statutory aggravating circumstances which the court may consider as listed in I.C. § 19–2515(f) are unconstitutionally vague; that the court unconstitutionally failed to consider the reduced capacity of the defendant at the time of the murder as being a mitigating circumstance; and that the weighing process of I.C. § 19–2515 is unconstitutional, in that it allows the imposition of a death sentence where aggravating circumstances do not outweigh mitigating circumstances beyond a reasonable doubt.

The decisions of the United States Supreme Court require that sentencing discretion be directed and limited, so as to promote consistency and to prevent a death sentence from being "wantonly" and "freakishly" imposed (*Furman v. Georgia,* 408 U.S. 238, 310, 92 S.Ct. 2726, 2762, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring)), and to provide a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not" (*id.,* at 313, 92 S.Ct. at 2764 (White, J., concurring); *Lockett v. Ohio,* 438 U.S. 586, 599, 98 S.Ct. 2954, 2962, 57 L.Ed.2d 973 (1978) (Burger, C.J., writing for the plurali-

ty); *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (Stewart, J., announcing the judgment of the court and an opinion in which Powell and Stevens, JJ., join)). At the same time, the sentencing process must allow flexibility, in order that it be humane and sensitive to the individual defendant. *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), *citing Lockett v. Ohio, supra.*

██ Thus, an almost unavoidable conflict presents itself to a legislature attempting to design a sentencing process that is both a consistent and principled system of punishment and one that is flexibly humane and cognizant of the uniqueness of each individual defendant. *See, Eddings v. Oklahoma, supra.* In Idaho, the aggravating circumstances which a sentencing judge may consider in pronouncing sentence in a capital case are clearly laid out in I.C. § 19–2515, and thus, to the extent possible, arbitrariness or the influence of prejudice is avoided, but the necessary individual consideration is nonetheless preserved. The open-ended allowance of mitigating evidence provides the defendant with the opportunity to present every possible justification for a sentence of less than death. Such an unlimited mitigation provision was approved in *Eddings v. Oklahoma, supra.* We hold, therefore, that the sentencing provisions of I.C. §§ 19–2501–2523 satisfy those guidelines, as we understand them, from the various holdings of the United States Supreme Court in death penalty cases.

██ We turn now to whether the sentencing judge complied with those statutory provisions. Appellant argues that the court erred in finding beyond a reasonable doubt that the defendant had previously been convicted of other murders; that the defendant had exhibited utter disregard for human life and a propensity to commit murder; that the defendant was under sentence for first degree murder at the time of his actions; and that both defendant and his victim were inmates at the state penitentiary when the crime occurred. We have reviewed the record and hold that the evidence at the sentencing hearing clearly supports the trial court's findings of aggravating and mitigating circumstances.

██ Appellant next asserts that the trial court erred, in that the judge weighed nonstatutory aggravating circumstances against mitigating circumstances, thereby allegedly violating the strictures of I.C. § 19–2515. This contention appears to arise from the format chosen by the court in drafting its findings. The findings were organized into sections, *i.e.,*

"4. Facts and Argument Found in Mitigation * * *

"5. Facts and Arguments Found in Aggravation [not expressly found beyond a reasonable doubt] * * *

"6. Statutory Aggravating Circumstances Found Under Section 19–2515(f), Idaho Code [expressly found beyond a reasonable doubt] * * *." (Material in brackets added.)

The court is not limited as to the circumstances it may find in aggravation to those listed under I.C. § 19–2515(f). Thus, that section of the court's findings denominated "5. Facts and Arguments Found in Aggravation," although including circumstances not statutorily listed and not expressly found beyond a reasonable doubt, is not error. I.C. § 19–2515(a) permits the court, upon the suggestion of either party that there are circumstances which might properly be considered in aggravation or mitigation, to hear those circumstances. That language strongly suggests that a judge should hear all relevant evidence which either party desires to set forth. Such an interpretation is not contradicted by I.C. § 19–2515(f), which merely lists the statutory aggravating circumstances, at least one of which must exist beyond a reasonable doubt if the ultimate sanction of death is to be imposed. As above stated, a wide scope of evidence of the personality and background of the accused must be available to the trial judge in order for the sentence to fit the individual defendant. *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). We hold that the list of aggravating factors set

forth in the statute is not exclusive, albeit one of those factors must necessarily be found to exist beyond a reasonable doubt for a sentence of death to be upheld. Where as here the sentencing judge formally finds, and his findings are substantiated, that there are statutory aggravating factors and those factors are not outweighed by mitigating circumstances, he has complied with the statutory directives. We find no error.

██ Appellant next asserts that certain factors set forth as aggravating circumstances by I.C. § 19–2515(f) are unconstitutionally vague, and he specifically challenges the findings that the appellant here had exhibited "utter disregard for human life," I.C. § 19–2515(f)(6), and a "propensity to commit murder," I.C. § 19–2515(f)(8).

In *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), relying on *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and on *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), we held that the challenged statutory language was sufficiently narrow, direct and objective to withstand a constitutional challenge of unconstitutional unfairness. We stated:

"A ... limiting construction must be placed upon the aggravating circumstances in I.C. § 19–2515(f)(6), that '[b]y the murder, or the circumstances surrounding its commission, the defendant exhibited utter disregard for human life.' To properly define this circumstance, it is important to note the other aggravating circumstances with which this provision overlaps. The second aggravating circumstance, I.C. § 19–2515(f)(2), that the defendant committed another murder at the time this murder was committed, obviously could show an utter disregard for human life, as could the third aggravating circumstance, I.C. § 19–2515(f)(3), that the defendant knowingly created a great risk of death to many persons. The same can be said for the fourth aggravating circumstance, I.C. § 19–2515(f)(4), that the murder was committed for remuneration. Since we will not presume that the legislative intent was to dupli-cate any already enumerated circumstance, thus making I.C. § 19–2515(f)(6) mere surplusage (*See,* e.g., *Norton v. Dept. of Employment,* 94 Idaho 924, 500 P.2d 825 (1972)), we hold that the phrase 'utter disregard' must be viewed in reference to acts other than those set forth in I.C. §§ 19–2515(f)(2), (3), and (4). We conclude instead that the phrase is meant to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer." *State v. Osborn, supra,* 102 Idaho at 418–419, 631 P.2d 200–201.

We hold that, by this limiting definition, we as a reviewing court have fulfilled the requirements of *Godfrey v. Georgia, supra,* having thus tailored and consistently applied the law according to a principled definition that avoids the arbitrary and capricious infliction of the death penalty. We therefore hold that the statutory aggravating circumstance of I.C. § 19–2515(f)(6), that by the murder and the circumstances surrounding it defendant exhibited an utter disregard for human life, is not unconstitutionally vague.

██ Likewise, we reject appellant's assertion that I.C. § 19–2515(f)(8) is impermissibly vague. That statute provides, as an aggravating circumstance, that "[t]he defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society." Under *Gregg* and *Furman,* that statutory language does not fail as being facially unconstitutional. Here, as contrasted with the argument in *Osborn* regarding the "utter disregard for human life," it cannot be asserted that the "propensity" circumstance could conceivably be applied to every murderer coming before a court in this state. We would construe "propensity" to exclude, for example, a person who has no inclination to kill but in an episode of rage, such as during an emotional family or lover's quarrel, commits the offense of murder. We would doubt that most of those convicted of murder would

again commit murder, and rather we construe the "propensity" language to specify that person who is a willing, predisposed killer, a killer who tends toward destroying the life of another, one who kills with less than the normal amount of provocation. We would hold that propensity assumes a proclivity, a susceptibility, and even an affinity toward committing the act of murder.

In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, J., in which Powell and Stevens, JJ., joined), a similar provision from Georgia's statutory list of aggravating circumstances was upheld, the Court noting that the Georgia Supreme Court had sufficiently narrowed its meaning to avoid its being indiscriminately applied. The Court stated, "[T]he petitioner points to § 27–2534.1(b)(3) which speaks of creating a 'great risk of death to more than one person.' While such a phrase might be susceptible of an overly broad interpretation, the Supreme Court of Georgia has not so construed it." *Id.*, 428 U.S. at 202, 96 S.Ct. at 2939.

In *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Court rejected an argument that the circumstance of "a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" was unconstitutionally vague. There the appellant had contended that the provision required the court to predict the future. It was noted that such speculation on future behavior is made by courts countless times daily in every sentencing decision and in every determination of bail, and by parole authorities constantly in probation decisions. *Jurek, supra*, 428 U.S. at p. 275, 96 S.Ct. at p. 2957 (opinion of Stewart, J., joined by Powell and Stevens, JJ.). White, J., joined by Chief Justice Burger and Rehnquist, J., concurred in the holding that the statutory aggravating circumstances of the Texas statute were sufficiently narrow in definition to withstand a challenge for vagueness. *Accord Proffitt v. Florida*, 428 U.S. 242, 255, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976). It has also been noted that, where a uniform process of appellate review is built in by way of a statutory requirement, there is an increased likelihood of consistent, well-guided application of such statutory aggravating circumstances. Such a system "can assure consistency, fairness and rationality in the evenhanded operation of the state law ... [T]his [type of] system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed." *Profitt v. Florida*, 428 U.S. 242, 259–260, 96 S.Ct. 2960, 2969–2970, 49 L.Ed.2d 913 (opinion of Powell, J., in which Stewart and Stevens, JJ., joined). *Accord Jurek v. Texas, supra*, 428 U.S. at 276, 96 S.Ct. at 2958; *Gregg v. Georgia, supra*, 428 U.S. at 205, 96 S.Ct. at 2940. Here our legislature has required that every capital sentencing decision be reviewed by this Court and has, in I.C. § 19–2827, further enhanced uniform application by requiring comparison of capital cases.

As applied to this particular defendant, the finding of propensity was clearly tailored and correct. The defendant here committed murder at least four times prior to the instant offense, twice in Idaho and also in Oregon and in California. There presently exist other pending charges of murder in the first degree against him. The testimony of an eyewitness to one of Creech's previous murders, coupled with psychiatric evidence, tends to prove that the appellant is violent and vengeful and that he experiences no remorse for his actions. Letters written by Creech to law enforcement personnel detail numerous alleged murders beyond those for which he has already been convicted and intimate his intentions to kill in the future. Creech's own statements claim responsibility for approximately 40 murders. However vague the statutory language might be argued to be in the ordinary case (which assertion we have already rejected), nevertheless, as applied in the instant case, we hold beyond any doubt whatsoever that the appellant here has exhibited a propensity to commit murder which will probably constitute a continuing threat to society.

Appellant next asserts that the trial court erred in its findings regarding aggravation

and mitigation, in that the court failed to consider the reduced capacity of the defendant at the time of the murder as a mitigating circumstance. Appellant argues that since the court did not mention such evidence in its finding, it must not have considered such evidence. While I.C. § 19–2515(d) directs that "the court shall set forth in writing any mitigating factors considered," the practical effect of that statute is not to require the judge to set out each and every circumstance *presented* to him in mitigation, but rather, the plain language of the statute, we hold, requires the judge to list that evidence which, in his capacity as a fact finder, he has found to be valid, competent, and pertinent to the issue of whether the death penalty should be imposed. To accept appellant's contention would result in a requirement that the judge set forth in writing every consideration that has been raised or has occurred to him as a potential factor in mitigation, a requirement we deem to be unworkable, impossible, and not to be gleaned from the statutory language.

 Clearly, the court heard and considered evidence of appellant's mental status from the testimony of the psychiatrist and the psychologist and from the voluminous information available in the presentence report. The court reasonably concluded that appellant was of average intelligence, that he had exhibited an excessive violent rage in committing the crime, and that he was beyond rehabilitation. The sentencing court is charged with evaluating the expert testimony and will not have its findings reversed absent a clear abuse of discretion. *Simpson v. Johnson,* 100 Idaho 357, 597 P.2d 600 (1979); *Roemer v. Green Pastures Farms, Inc.,* 97 Idaho 591, 548 P.2d 857 (1976). This rule of evidence applies in criminal as well as in civil cases. I.C.R. 26. We hold the above findings of the trial court are amply supported by the evidence.

 Appellant next asserts that the process of weighing aggravating and mitigating circumstances, as set forth by I.C. § 19–2515(b), is unconstitutional. Appellant urges us to adopt a standard that,

before a death sentence may be imposed, "the sentencing authority must be persuaded beyond a reasonable doubt that total mitigation is outweighed by total aggravation, and that beyond a reasonable doubt the imposition of death is justified," and that otherwise the penalty must be less than death.

That same contention was dealt with by this Court in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981). *Osborn* is controlling and dispositive here. We there stated:

"The weighing process, in our opinion does not involve shifting the burden of persuasion but is concerned instead with the presentation of relevant information to the sentencer in order that a reasoned and considered decision can be reached. The defendant's burden is merely to raise, in the aggravation-mitigation hearing, any factors which might possibly tend to mitigate his culpability for the offense. He has full opportunity to present and argue those factors. The court below then evaluates those factors under the guidelines set forth in the statute. His decision, including his reasoning, is then set forth in detail and this court reviews the entire process. While it is possible to speak of a 'burden' of persuasion on the defendant to establish why he should receive leniency, we feel that, under our sentencing process, the facts speak for themselves once presented. The completeness of the evaluative process below and the mandatory review by this court, we feel, withstands constitutional scrutiny. *Tichnell v. State,* 287 Md. 695, 415 A.2d 830, 848–50 (1980); *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253, 1258–9 (1978), *cert. den.* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979)." *State v. Osborn, supra,* 102 Idaho at 417, 631 P.2d at 199.

 Appellant next asserts that Idaho's death penalty provisions are unconstitutional, in that jury participation is not required in the sentencing decision, but rather the discretion to impose a death sentence is vested in a judge. At other places or at other times, juries have been given an inte-

gral role in imposing the death sentence. However, we hold that jury participation in the sentencing process is not constitutionally required.

*Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its progeny have consistently conditioned the validity of death penalty provisions upon their capacity to be consistently, specifically, and non-arbitrarily interpreted. The consensus of the holdings in death penalty cases is that a death penalty scheme fails the constitutional test if it is reasonably susceptible of irregular, wanton, or freakish application, not only as codified by the legislature but also as interpreted by the courts. We deem consistency to be a key requirement in the upholding of death penalty provisions as being constitutional.

On the subject of comparative consistency of judge or jury sentencing, it was stated in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976):

"This Court has pointed out that jury sentencing in a capital case can perform an important societal function, *Witherspoon v. Illinois,* 391 U.S. 510, 519 n. 15 [88 S.Ct. 1770, 1775 n. 15, 20 L.Ed.2d 776] (1968), but *it has never suggested that jury sentencing is constitutionally required.* And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases." *Id.,* 428 U.S. at 252, 96 S.Ct. at 2966 (Stewart, J., joined by Powell and Stevens, JJ.). (Emphasis added.)

*See also Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

We hold that there is no federal constitutional requirement of jury participation in the sentencing process and that the decision to have jury participation in the sentencing process, as contrasted with judicial discretion sentencing, is within the policy determination of the individual states. We are left to an examination of the exercise of discretion by our legislature in its adoption of policy. Even assuming that it is appropriate for this Court to examine the validity of the legislative policy determination, we would agree with our legislature that judicial control of the sentencing process is preferable to jury participation, in that the constitutionally mandated consistency of result is more probable in the case of judicial sentencing.

■ Our attention is drawn to no authority or data, other than the bare assertion of appellant, which indicates that judges do not reflect community norms. Contrary to what may be the case in some states, Idaho's judges are not ivory tower elitists. Although they may wear the robe and sit on an elevated bench, they nevertheless are elected from the communities in which they are required to reside. Our magistrate judges are required to stand for retention and the percentage of their retention vote is generally assumed to, in part at least, be a result of their community's evaluation of them and the extent to which they comply with the community's norms and values. Indeed, in the last election, a number were evidently not held by the electorate to represent the community norms and values and so were terminated in office. So also our district judges must stand for election every four years, with the resultant oft-contested judicial seats. The outcome of recent elections demonstrates that our district judges are not insulated from their communities and that their positions are anything but lifetime sinecures.

Further, in evaluating our legislatively mandated death penalty sentencing in Idaho, we note that the Supreme Court of the United States has often recognized that legislative enactments are a reliable gauge and "indicia of societal values." *Woodson v. North Carolina,* 428 U.S. 280, 288, 96 S.Ct. 2978, 2983, 49 L.Ed.2d 944 (1976), *citing Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). We hold that the policy judgment of our legislature, which places capital sentencing discretion in the district judges of our state with mandatory appellate review vested in this Court

of statewide jurisdiction, meets any test of constitutionality.

■ Finally, we turn to the requirements of I.C. § 19–2827, whereby in every death penalty case this Court is enjoined to review the record to ascertain whether passion, prejudice or any other arbitrary factor has influenced the determination to impose the death sentence and whether the death sentence is excessive or disproportionate to that imposed in similar cases.

We have reviewed three of the more recent cases to come before this Court which have involved the death penalty. In *State v. Creech,* 99 Idaho 779, 589 P.2d 114 (1979), and *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979), although both Creech and Lindquist had been sentenced to death, this Court vacated the death sentences, on the basis that *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), had effectively invalidated Idaho's then mandatory death penalty statutes. In *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979), this Court affirmed the trial court's holding that at the time defendant Needs was sentenced on her first degree murder conviction, no valid sentencing statute existed for the crime of first degree murder, and hence we affirmed the trial court's maximum sentence for second degree murder.

Since the legislative amendment in 1977 of our death sentence provisions to their present form, only one case has been presented to this Court which dealt with a first degree murder conviction or a homicide sufficiently heinous as to arguably be comparable to the circumstances here as a "similar case" under I.C. § 19–2827, *i.e., State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981). In *Osborn,* the Court did not find the death sentence to be disproportionately harsh, but remanded to the trial court for findings relating to the mitigating factors.

We conclude that in our consideration of the proportionality of the sentence imposed here, those "similar cases" most nearly comparable are *Creech, Lindquist, Needs,* and *Osborn* since, despite the invalidation of the sentences on other grounds, nevertheless the facts and circumstances underlying the imposition of the death penalty in those cases are worthy of consideration in weighing whether the sentence imposed in the instant case is disproportionate.

The death penalty was imposed in *Creech I,* which resulted from a conviction for two counts of first degree murder. The record there reveals substantially the same personal background of Creech as is shown in the instant case. The circumstances of that offense indicated that Creech was hitchhiking with a female friend and they were given a ride by two men who during the course of the trip were interpreted by Creech as attempting to flirt with his friend. Creech shot the two men in cold blood and threw their bodies off the side of the road. According to the eyewitness, Creech displayed no emotion thereafter and acted as if the killings were of no moment.

Lindquist and the victim's husband conspired to murder the victim for the purpose of collecting life insurance policies. Several attempts were made on the life of the victim and finally Lindquist, at the instance of the victim's husband, met the pregnant victim at a remote site, where he shot her several times through the windows of her car and then completed the killing by pulling her from the car and clubbing her to death.

In *Osborn,* the defendant had worked with and was a friend of the victim, who had threatened to inform on the defendant for a robbery offense. The victim's partially clothed body was found alongside a road. She had been extensively beaten about the head and face, and shot three times in the head, once in the shoulder, and once in the abdomen.

In *Needs,* the defendant had previously been convicted of homicide and on several occasions had threatened to kill the victim, who was her husband. She was convicted of the murder of her husband. The remains of the victim consisted of a partially burned torso without head or arms. Although the torso contained numerous stab wounds, they did not cause death, which probably

resulted from gunshots, decapitation or a slit throat. As above noted, although the death sentence may well have been justified, it was held that no valid sentencing statute then existed for the crime of first degree murder.

We hold that none of these recent Idaho murder decisions militates toward the granting of leniency in the present case. We find no instance in which a defendant found guilty of such previous crimes as those of Thomas Creech has been found deserving of a sentence less than death. We have examined cases dating back more than 50 years[2] and our examination fails to disclose that any such remorseless, calculating, cold-blooded multiple murderer has (with the exception of *Creech I*) ever been before this Court. *See however, State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (Ariz. 1983). We hold that the death penalty imposed in this case is both proportionate and just.

Although claims of unconstitutional double jeopardy and ex post facto application of law are not raised by appellant, since resentencing has taken place as discussed *supra,* we have considered such possible problems. We find no constitutional violation in either regard. *Knapp v. Cardwell,* 667 F.2d 1253 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982). *See also, State v. Gretzler, supra.*

In accord with the foregoing, we affirm the trial court's imposition of the death penalty.

DONALDSON, C.J., and BAKES, J., concur.

HUNTLEY, Justice, dissenting.

Despite the fact that the nature of the crime together with the aggravating factors make this case one where, if ever the death penalty is to be imposed, it should be here, I must dissent.

I would remand for utilization of proper sentencing procedures because the precedent the majority sets here, if followed in future cases, will do great violence to two very basic tenets of the criminal justice system of this state:

(1) the right to trial by jury and

(2) the right of the accused to confront the witnesses against him.

*State v. Ward,* 98 Idaho 571, 569 P.2d 916 (1977); *State v. Beason,* 95 Idaho 267, 506 P.2d 1340 (1973); *State v. Foley,* 95 Idaho 222, 506 P.2d 119 (1973); *State v. Atwood,* 95 Idaho 124, 504 P.2d 397 (1972); *State v. Gomez,* 94 Idaho 323, 487 P.2d 686 (1971); *State v. Radabaugh,* 93 Idaho 727, 471 P.2d 582 (1970); *State v. Dillon,* 93 Idaho 698, 471 P.2d 553 (1970), *cert. denied,* 401 U.S. 942, 91 S.Ct. 947, 28 L.Ed.2d 223 (1971); *King v. State,* 93 Idaho 87, 456 P.2d 254 (1969); *State v. Gonzales,* 92 Idaho 152, 438 P.2d 897 (1968); *Carey v. State,* 91 Idaho 706, 429 P.2d 836 (1967); *State v. Hall,* 86 Idaho 63, 383 P.2d 602 (1963); *State v. Clokey,* 83 Idaho 322, 364 P.2d 159 (1961); *State v. Burris,* 80 Idaho 395, 331 P.2d 265 (1958); *State v. Snowden,* 79 Idaho 266, 313 P.2d 706 (1957); *State v. Owen,* 73 Idaho 394, 253 P.2d 203 (1953); *State v. Buchanan,* 73 Idaho 365, 252 P.2d 524 (1953); *State v. Golden,* 67 Idaho 497, 186 P.2d 485 (1947); *State v. Boyatt,* 59 Idaho 771, 87 P.2d 992 (1939); *State v. Van Vlack,* 58 Idaho 248, 71 P.2d 1076 (1937); *State v. Reding,* 52 Idaho 260, 13 P.2d 253 (1932); *State v. Wilson,* 41 Idaho 616, 243 P. 359 (1925); *State v. Hoagland,* 39 Idaho 405, 228 P. 314 (1924); *State v. Ramirez,* 34 Idaho 623, 203 P. 279 (1921).

---

**2.** I.C. § 19–2827(g) instructs this Court to "collect and preserve the records of all cases in which the penalty of death was imposed from and including the year 1975." Further, we are charged with determining in each case "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." I.C. § 19–2827(c)(3). Although we read these provisions as requiring a comparison of the capital cases from 1975 to the present, we have deemed it appropriate to conduct an extensive and thorough review of Idaho murder cases. Our survey has included the following:

*State v. Le Page,* 102 Idaho 387, 630 P.2d 674 (1981). *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981); *State v. Garcia,* 102 Idaho 378, 630 P.2d 665 (1981); *State v. Otto,* 102 Idaho 250, 629 P.2d 646 (1981); *Watkins v. State,* 101 Idaho 758, 620 P.2d 792 (1980); *State v. Fuchs,* 100 Idaho 341, 597 P.2d 227 (1979); *State v. Lopez,* 100 Idaho 99, 593 P.2d 1003 (1979); *State v. Warden,* 100 Idaho 21, 592 P.2d 836 (1979); *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979); *State v. Creech,* 99 Idaho 779, 589 P.2d 114 (1979); *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979);

I

The Idaho Constitution, as first approved on July 3, 1890, and as it reads today, provides in Art. 1, § 7:

"Right to trial by jury.—The right of trial by jury shall remain inviolate . . . ."

That right of trial by jury as it existed at the time our constitution was adopted provided for jury participation in the capital sentencing process. Section 17 of the Criminal Practice Act of 1864 provided in pertinent part:

"[A]nd the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict, whether it be murder of the first or second degree; but, if such person shall be convicted on confession in open court, the court shall proceed, by examination of witnesses, to determine the degree of the crime, and give sentence accordingly. Every person convicted of murder of the first degree, shall suffer death; and every person convicted of murder in the second degree, shall suffer imprisonment in the territorial prison for a term not less than ten years, and which may be extended to life."

In other words, the jury, by determining whether the party was guilty of either first or second degree murder, determined whether or not the death penalty would be imposed.

In *Blue Note Inc. v. Hopper,* 85 Idaho 152, 157, 377 P.2d 373 (1962), we stated:

"The provisions of the constitution pertaining to the right to trial by jury are construed to apply as it existed at the date of the adoption of the constitution."

*Accord: Anderson v. Whipple,* 71 Idaho 112, 227 P.2d 351 (1951); *Christensen v. Hollingsworth,* 6 Idaho 87, 53 P. 211 (1898); *Comish v. Smith,* 97 Idaho 89, 540 P.2d 274 (1975).

Idaho continued to employ the jury in the capital sentencing process during all of the intervening years until the Supreme Court of the United States struck down the death penalty statutes of most states through its 1972 decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.

At the time of *Furman,* I.C. § 18–4004 read:

"Punishment for murder.—Every person guilty of murder in the first degree shall suffer death or be punished by imprisonment in the state prison for life, and the jury may decide which punishment shall be inflicted. Every person guilty of murder in the second degree is punishable by imprisonment in the state prison not less than ten years and the imprisonment may extend to life."

In its first post-*Furman* session (1973), the Idaho legislature deleted the jury function from I.C. § 18–4004 and made all convictions of first degree murder subject to the death penalty. This was done in an attempt to remove the "cruel and unusual punishment" aspects disapproved in *Furman.* I.C. § 18–4004 was amended by striking out the words as lined out below:

"18–4004. PUNISHMENT FOR MURDER.—Every person guilty of murder in the first degree shall suffer death ~~or be punished by imprisonment in the state prison for life, and the jury may decide which punishment shall be inflicted.~~ Every person guilty of murder in the second degree is punishable by imprisonment in the state prison not less than ten years and the imprisonment may extend to life."

The 1973 amendment restored the law to its 1864 standing.

After the United States Supreme Court in a series of cases declared statutes of other states which were similar to Idaho's 1973 version unconstitutional, the Idaho legislature responded in 1977 with the present statutory scheme providing for inquiry into mitigating or aggravating circumstances as set forth in I.C. § 19–2515 et seq. That amendment changed the statute back to its pre-1973 language except that it omitted restoring the jury function and added the reference to I.C. § 19–2515:

"18–4004. PUNISHMENT FOR MURDER. ~~Every~~ *Subject to the provisions of 19–2515, Idaho Code, every* person guilty

of murder ~~in~~ *of* the first degree shall ~~suffer~~ *be punished by* death *or by imprisonment for life.* Every person guilty of murder ~~in~~ *of* the second degree is punishable by imprisonment ~~in the state prison~~ not less than ten (10) years and the imprisonment may extend to life."

Except for four states which entirely abolished capital punishment in the nineteenth century, every American jurisdiction has at least at some time employed jury sentencing in capital cases. *McGautha v. California,* 402 U.S. 183, 200 n. 11, 91 S.Ct. 1454, 1463 n. 11, 28 L.Ed.2d 711 (1971). During a period of over a century, beginning in 1838, jurisdiction after jurisdiction that retained the death penalty replaced its mandatory capital punishment law with discretionary jury sentencing, *Woodson v. North Carolina,* 428 U.S. 280, 291–92, 96 S.Ct. 2978, 2985, 49 L.Ed.2d 944 (1976) (plurality opinion). By the time of the *Furman* decision in 1972, Colorado was the only state in the nation to impose capital punishment without jury involvement in the sentencing process.

Despite the long history at common law and under statutory law of the states throughout this nation of involving the jury in the capital sentencing process, the Idaho legislature in the present statute enacted in 1977 totally excluded the jury from its traditional function. The legislative history shows that the legislature was not even presented with a bill which provided for jury participation. The only bill presented, was one drafted by the attorney general, Senate Bill 1082, which was presented to the legislature with the following statement of purpose:

"RS 1954

S 1082

STATEMENT OF PURPOSE

Only a few years ago, the United States Supreme Court made new "rules" concerning the imposition of the death penalty for serious crimes. *So that we conformed with this U.S. Supreme Court interpretation* of the federal Constitution, the *Idaho Legislature enacted in 1973 our present death penalty* Sections 18–4003 and 18–4004, *Idaho Code.*

Then, last year, the United States Supreme Court again changed the rules relating to capital punishment—after many states, like Idaho, had acted in response to its previous decision. The Court, in five cases, set forth new, more definitive rules concerning sentencing where the death penalty was sought to be imposed.

*The purpose of this bill is to codify into Idaho law these present requirements imposed on the states by these most recent United States Supreme Court decisions on capital punishment so that we will conform with this latest expression of the law."* (Emphasis supplied.)

The statement of purpose is misleading insofar as it suggests that the Supreme Court decisions mandated the removal of the jury from its traditional powers and functions; the United States Supreme Court never at an earlier time or in this "latest expression of the law" required jury non-involvement.

This dissent would be incomplete without a statement of some of the reasons why jury participation in the capital sentencing process is required, not only upon the basis of historical practice, but also from the standpoint of compliance with the mandates of the constitutions of the United States and the State of Idaho. An excellent presentation of these matters is set forth in appellant's brief, at pp. 69 through 80, which I adopt by reference and affix hereto as Appendix A.

Since jury participation in the capital sentencing process is part of the right to "trial by jury" as guaranteed inviolate by Art. 1, § 7 of the Idaho Constitution, I would reverse and remand for proper sentencing and would urge the legislature to amend the statutes to provide for proper jury participation in order that future capital punishment cases will not be subject to this serious defect.

II

Idaho Code § 19–2516 requires that the hearing to determine aggravating and miti-

gating circumstances during the sentencing process must be presented by the testimony of live witnesses, that section reading in pertinent part:

"The circumstances must be presented by the testimony of witnesses examined in open court ..."

The attorneys for Mr. Creech made timely and appropriate motion to have the proceeding conducted through the use of live witnesses. The court denied the motion and took "judicial notice" of its file. The file contained letters with no foundation, a presentence report containing a mass of information (much of which was uncorroborated or unattributed), and newspaper clippings. The court also considered a transcript of a preliminary hearing which was conducted before discovery had been completed.

The position asserted by the majority that the only way to reconcile I.C. § 19–2516 (providing for witnesses) with I.C. § 19–2515 (requiring that a presentence investigation report be ordered) is illogical and a fallacious syllogism.

The two sections can be read together with the following meaning:

(1) A presentence report shall be ordered in every capital case; § 19–2515(c);

(2) Findings of aggravating and mitigating circumstances can be based upon the presentence report and representations of counsel *unless* either party demands a formal hearing;

(3) If requested by either party, the court must make findings of statutory aggravating and mitigating circumstances based only on a live record. § 19–2516;

(4) All evidence and the presentence report can be relied on during the weighing process.

In *Mullaney v. Wilbur,* 421 U.S. 684, 698, 95 S.Ct. 1881, 1889, 44 L.Ed.2d 508 (1975), the United States Supreme Court stated:

"Where proof of specified facts may determine whether a defendant will live or die, the constitutional requirement for the procedure controlling the proof cannot depend on the state's choice of the stage of the litigation at which the proof is to occur. If, as here, the determination of certain statutorily defined facts 'may be of greater importance than the difference between guilt or innocence for many lesser crimes,' the state cannot avoid the constitutional requirements for proof of those facts 'by characterizing them as factors that bear solely on the extent of the punishment.' "

Capital sentencing is qualitatively different from other sentencing proceedings, and there is therefore a need for special reliability in the proceedings. This was recognized by the United States Supreme Court in *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976):

"[T]he penalty of death is qualitatively different from a sentence of imprisonment however long. Death, in its finality, differs more from life imprisonment than a 100 year term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."

The result flowing from the majority decision today is rather a curious anomaly in Idaho law. I know of no other proceeding in district court, presided over by a district judge, and presented by attorneys, wherein hearsay and other incompetent and unreliable evidence is permitted. The one exception we now carve out for relaxed and non-professional evidentiary standards is in capital sentencing proceedings.

Perhaps to some the capital sentencing proceeding is not as important as other matters routinely conducted in our district courts—I prefer to believe that the proceedings rank very high on the scale of importance—both to the concerned defendant and to all of those who believe that one important measure of the quality of a society is the standard of fairness and procedural safeguards provided by the criminal justice system.

*Proffitt v. Wainwright,* 685 F.2d 1227 (11th Cir.1982), noting that the United States Supreme Court has not directly ruled on the issue, held that the capital sentencing proceeding, even though in a hearing bifurcated from the trial on guilt or innocence, is an integral part of the trial and that therefore it is required that the defendant have a right to confront and cross-examine witnesses, *Proffitt,* 685 F.2d at 1253, reading as follows:

"Although the [Supreme] Court has held capital sentencing proceedings must meet certain procedural requirements, it has not yet delineated the exact scope of constitutional procedural protection to which capital defendants are entitled. *See Gardner v. Florida,* 430 U.S. [349] at 358 n. 9, 97 S.Ct. [1197] at 1204 n. 9 [51 L.Ed.2d 393]. Whether the right to cross-examine adverse witnesses extends to capital sentencing proceedings has not been specifically addressed by the Supreme Court and is an issue of first impression in this Circuit. We must therefore decide this question in accord with the general principles articulated by the Supreme Court in its recent death penalty decisions.

The focus of the Court's current capital sentencing decisions has been toward minimizing the risk of arbitrary decision-making. [Citations omitted.] Whereas earlier cases had focused on the quantity of information before the sentencing tribunal, recently the Court has shown greater concern for the quality of such information. *Gardner v. Florida,* 430 U.S. at 359, 97 S.Ct. at 1205. Thus, it has recognized the defendant's interest both in presenting evidence in his favor, *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio, supra,* and in being afforded the opportunity to explain or rebut evidence offered against him. *Gardner v. Florida,* 430 U.S. at 362, 97 S.Ct. at 1207. Reliability in the factfinding aspect of sentencing has been a cornerstone of these decisions.

*Id.* at 359–60, 362, 97 S.Ct. at 1205; *Woodson v. North Carolina,* 428 U.S. at 305, 96 S.Ct. at 2991.

In *Gardner v. Florida supra,* the Supreme Court held that a judge's reliance, in imposing the death penalty, on information not disclosed to the defendant or his attorney violated the defendant's rights to due process and freedom from cruel and unusual punishment. *Gardner is premised on the principle that death sentences may not constitutionally be imposed on the basis of information that the capital defendant has been afforded no opportunity to rebut.*[1] *See id. at 362, 97 S.Ct. at 1206.* The holding in *Gardner* narrowly viewed, simply prohibits the use of 'secret information'; the Court did not in that case address the scope of the capital defendant's procedural rights in attempting to rebut information that has openly been presented to the sentencing tribunal. In reaching its decision in *Gardner,* however, the Court emphasized the unacceptability of the 'risk that some information accepted in confidence may be erroneous, or may be misinterpreted, by the ... sentencing judge.' *Id.* at 359, 97 S.Ct. at 1205. Moreover, the Court expressly recognized the importance of participation by counsel and adversarial debate to eliciting the truth and 'evaluating the relevance and significance of aggravating and mitigating' evidence. *Id.* at 360, 97 S.Ct. at 1205. The Supreme Court's emphasis in *Gardner* and other capital sentencing cases on the reliability of the factfinding underlying the decision whether to impose the death penalty convinces us that *the right to cross-examine adverse witnesses applies to capital sentencing hearings.* The Supreme Court has recognized the cross-examination as 'the "greatest legal engine ever invented for the discovery of truth"' *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (quoting 5 J. Wigmore, Evidence § 1367 (3d ed. 1940)).

1. Since the persons supplying most of the presentence information were not in court, Creech could not "rebut" through the device of cross-examination. (The presentence report was thirteen pages long with attachments of hearsay measuring 2⅝ inches in depth.)

'The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the custodial right of confrontation, and helps assure the "accuracy of the truth-determining process." It is, indeed, "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accomodate other legitimate interests in the criminal process. *But its denial or significant diminution calls into question the ultimate "'integrity of the fact-finding process'"* [emphasis in original] and requires that the competing interest be closely examined.' *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973) (citations omitted).

Where expert witnesses are employed, cross-examination is even more crucial to ensuring accurate fact-finding. Since, as in this case . . . information submitted by an expert witness generally consists of opinions, cross-examination is necessary not only to test the witness's knowledge and competence in the field to which his testimony relates but also to elicit the facts on which he relied in forming his opinions.

Finally, we note that the decision of the former Fifth Circuit in *Smith v. Estelle,* 602 F.2d 694 (5th Cir.1979), aff'd, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), buttresses our conclusion that appellant had a constitutional right to cross-examine Dr. Sprehe before the doctor's report could be used in determining sentence. In *Smith,* we reversed a death sentence that was based in part on the testimony of a psychiatrist whose name the prosecution had intentionally omitted from its witness list. A primary basis for the decision in that case was that the prosecution's failure to disclose its intent

to call the doctor *prevented the defendant's counsel from conducting effective cross-examination. See id.* at 699–701 & n. 7. Although the court did not specifically address whether the defendant had a constitutional right to cross-examine the psychiatrist, it concluded that his testimony, 'not effectively cross-examined by the [defense attorneys,] carries no assurance of reliability whatever,' *id.* at 701, and hence that its use in sentencing the defendant violated the principles set forth in *Gardner v. Florida.* The reasoning in *Smith* clearly supports the view that the right to cross-examine adverse witnesses applies to capital sentencing proceedings, at least where necessary to ensure the reliability of the witnesses' testimony." [2] (Emphasis supplied.)

Since the sentencing procedure is an integral part of the trial, the defendant should be entitled in Idaho to both the participation of a jury and the right to confront and cross examine witnesses. This case should be remanded for a hearing which provides those two fundamental constitutionally mandated elements of due process and fair trial.

The magnitude and numerosity of Creech's crimes makes it unpopular and therefore difficult for me to urge any further proceedings and delay in bringing this saga to its ultimate conclusion. Nevertheless, I think more important than any one case is the preservation of our judicial process.

BISTLINE, J., concurs.

### APPENDIX A

P. THE EIGHTH AMENDMENT'S PRINCIPLE THAT DEATH SENTENCES MUST SATISFY EVOLVING STANDARDS OF DECENCY AND THE DIGNITY OF MAN REQUIRES JURY PARTICIPATION IN CAPITAL SENTENCING.

In view of the "awesome finality of a capital case," *Kinsella v. Singleton,* 361 U.S.

2. The Creech presentence report contained reports of several Idaho psychiatrists and psychologists, a presentence report with attachments from Ohio, including psychiatric evaluations from Ohio physicians and psychologists, numerous newspaper stories, psychiatric evaluations from Oregon doctors and numerous other materials supplied by persons not presented for cross-examination.

234, 249 [80 S.Ct. 297, 305, 4 L.Ed.2d 268] (1960) (Harlan, J., concurring and dissenting), the Supreme Court has repeatedly recognized the crucial role juries play in the determination whether a capital defendant merits the death sentence. *Gregg v. Georgia, supra,* 428 U.S. at 181–82, 190–92 [96 S.Ct. at 2928–2929, 2933–2934]; *see, Duncan v. Louisiana,* 391 U.S. 145, 156 [88 S.Ct. 1444, 1451, 20 L.Ed.2d 491] (involvement of jury in capital cases reflects a "reluctance to entrust plenary powers over . . . life [and death] . . . to one judge or a group of judges." [25]

That the Eighth Amendment requires at least some jury participation in capital sentencing can best be appreciated by reference to the substantive Eighth Amendment standards the Court has invoked in holding that the death penalty is not invariably cruel and unusual punishment.

Basically, The Court has explained that a particular punishment is not cruel and unusual if it satisfies two criteria. First, the penalty must accord with contemporary moral and social values by reflecting "the evolving standards of decency that mark the progress of a maturing society." *Gregg v. Georgia, supra,* 428 U.S. at 173 [96 S.Ct. at 2925], *quoting Trop v. Dulles,* 356 U.S. 86, 101 [78 S.Ct. 590, 598, 2 L.Ed.2d 630] (1958) (plurality opinion). Second, the punishment must respect "the dignity of man" by serving legitimate penological goals and

by bearing a reasonably proportionate relationship to the crime for which it is imposed. *Gregg v. Georgia, supra* 428 U.S. at 173 [96 S.Ct. at 2925]. In holding that the penalty of death for murder does not necessarily violate these standards, the *Gregg* plurality's unmistakable theme was that, under the Eighth Amendment, imposition of the death penalty on a defendant must find validation in the responsible moral and social values of the community that condemns him. An essential medium of those values is the jury.

To support its conclusion that imposition of the death penalty in some circumstances could accord with "evolving standards of decency," the *Gregg* plurality looked to the two most reliable sources of responsible public attitudes and values: legislatures and juries.[26] Thus, even with respect to the *general* question whether the death penalty comports with evolving social and moral standards, the plurality found it necessary to rely on patterns of jury behavior. The plurality's emphasis on *evolving* standards, *id.* at 172–73 [96 S.Ct. at 2924–2925], suggests that this Eighth Amendment principle is organic, requiring the courts to continually refer to the moral development of American society. The courts cannot rely on legislatures alone as reflectors of responsible community values. Legislators confront capital punishment abstractly. They determine whether a society is willing to have a law permitting capital punishment, not whether the society, through the instru-

---

**25.** Dictum in *Proffitt v. Florida,* 428 U.S. 242, 252 [96 S.Ct. 2960, 2966, 49 L.Ed.2d 913] (1976) (plurality opinion), notes that the Court has never expressly stated that the Constitution requires jury sentencing in capital cases. *Proffitt,* however, approved a capital sentencing scheme very different from Idaho's. In contrast to the complete exclusion of the jury in Idaho, the Florida scheme entitles the defendant to an advisory jury verdict on penalty, *id.,* at 249, 251–53 [96 S.Ct. at 2965, 2966–2967], and the sentencing judge must abide by a jury recommendation of mercy unless "the facts suggesting a death sentence [are] . . . so clear and convincing that virtually no reasonable person could differ." *Tedder v. State,* 322 So.2d 908, 910 ( [Fla.] 1975), *quoted in Proffitt v. Florida, supra,* 428 U.S., at 249 [96 S.Ct., at 2965]. Plainly, *Proffitt* in no way resolved the constitutionality of all-judge capital sentencing;

indeed, in two *post-Proffitt* cases a majority of the Supreme Court has expressly reserved any decision on that issue. *Bell v. Ohio,* 438 U.S. 637, 642 n. * [98 S.Ct. 2977, 2980 n. *, 57 L.Ed.2d 1010] (1978); *Lockett v. Ohio,* 438 U.S., 586, 609 n. 16 [98 S.Ct. 2954, 2967 n. 16, 57 L.Ed.2d 973].

**26.** The plurality noted that a majority of the state legislatures had reenacted the death penalty after the Court's 1972 *Furman* decision, *Gregg v. Georgia,* 428 U.S. 153, 179–81 [96 S.Ct. 2909, 2928–2929, 49 L.Ed.2d 859] (1976) (plurality opinion), and that since *Furman* American juries, though imposing the death penalty infrequently, had done so often enough to suggest that they did not categorically disapprove of the penalty. *Id.,* at 181–82 [96 S.Ct. at 2928–2929].

ment of the jury, is willing to carry out that law. *Lockett v. Ohio,* 438 U.S. 586, 625 [98 S.Ct. 2954, 2983, 57 L.Ed.2d 973] (1978) (White, J., concurring and dissenting).[27] Moreover, a statute is static, and, as public values change, it may become a less reliable indicator than the judgment of a jury. Therefore, unless juries, one of the two essential barometers of social values, play some role in capital sentencing, the courts cannot confidently determine whether capital punishment does indeed continue to comport with responsible public views.[28]

The Eighth Amendment demands more, however, than general social approval of the death penalty as a permissible means of punishment. Because the death penalty is "so profoundly different from all other penalties," *Lockett v. Ohio, supra,* 438 U.S. at 605 [98 S.Ct. at 2965] (plurality opinion), the Eighth Amendment also demands *individualized* consideration of the propriety of the death sentence in every capital case. *Ibid.* Given "[t]he need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual," *Ibid.,* state capital sentencing schemes must ensure that individual death sentences satisfy the moral demands of evolving standards of decency. *See Woodson v. North Carolina,* 428 U.S. 280, 303–305 [96 S.Ct. 2978, 2990–2991, 49 L.Ed.2d 944] (1976) (plurality opinion); *Godfrey v. Georgia,* 446

U.S. 420, 427–28 [100 S.Ct. 1759, 1764–1765, 64 L.Ed.2d 398] (1980) (plurality opinion). Whatever partial role the legislature can play in reflecting responsible public sentiment on the *general* validity of the death penalty, only a jury can ensure that a *particular* death sentence meets this Eighth Amendment command. As the *Gregg* plurality stressed, " 'one of the most important functions any jury can perform in making . . . a selection [between life imprisonment and death for a defendant convicted in a capital case] . . . is to maintain a link between contemporary community values and the penal system.' " *Gregg v. Georgia, supra* 428 U.S., at 181 [96 S.Ct., at 2929] (plurality opinion), *quoting Witherspoon v. Illinois, supra,* 391 U.S. at 519 n. 15 [88 S.Ct. at 1775 n. 15]; *see Proffitt v. Florida,* 428 U.S. 242, 252 [96 S.Ct. 2960, 2966, 49 L.Ed.2d 913] (1976) (plurality opinion).

In testing the death penalty against the second substantive Eighth Amendment requirement, the "dignity of man," *Gregg* stated that one of the two legitimate penological goals justifying execution was retribution. *Gregg v. Georgia, supra,* 428 U.S. at 183 [96 S.Ct. at 2929]. *Gregg* thereby reinforced the principle that the proper infliction of the death penalty is an essentially communal decision requiring a reflection of responsible communal values.[29] "Indeed,

**27.** The tendency of juries to nullify the legislative intent of some criminal laws indicates that the legislature alone cannot represent the evolution of community sentiment in criminal matters. Examples are abundant. American juries regularly refused to convict for liquor violations during Prohibition, and continue to refuse. *H. Kalven & H. Zeisel, The American Jury,* 292 n. 10 (1966). A survey of traffic law enforcement studies concludes that increasing the penalties for drunken driving changes jury behavior in such cases so as to minimize or even annul the increase. Ross, *The Neutralization of Severe Penalties: Some Traffic Studies,* 10 L. & Soc.Rev. 403, 410 1976). And as sentiment against the Vietnam War rose from 1968 to 1971, so did jury acquittals in draft-evasion cases. Kritzer, *Enforcing the Selective Service Act: Deterrence of Potential Violators,* 30 *Stan. L.Rev.* 1149, 1156 n. 31 (1978).

**28.** Indeed, in the last 9 years, 8 of the Justices have written or joined opinions that look to the pattern of jury verdicts in support of a conclu-

sion about the constitutionality of the death penalty, either generally, or for particular crimes. *Lockett v. Ohio,* 438 U.S. 586, 624–25 [98 S.Ct. 2954, 2983–2984, 57 L.Ed.2d 973] (1978) (White, J., concurring and dissenting); *Coker v. Georgia,* 433 U.S. 584, 596 [97 S.Ct. 2861, 53 L.Ed.2d 982] (1977) (White, J., joined by Stewart, Blackmun, & Stevens, JJ.); *Woodson v. North Carolina, supra,* 428 U.S., at 293 [96 S.Ct., at 2986] (Stewart, Powell & Stevens, JJ.); *Furman [Gregg] v. Georgia, supra,* 428 U.S., at 181 [96 S.Ct., at 2928] (Stewart, Powell & Stevens, JJ.); *Furman v. Georgia, supra,* 408 U.S. at 439–40 [92 S.Ct. at 2828–2829] (Powell, J., dissenting, joined by Burger, C.J., and Blackmun & Rehnquist, JJ.); *id.,* at 299–300 [92 S.Ct. at 2757–2758] (Brennan, J.).

**29.** The plurality stressed that "capital punishment is an expression of society's moral outrage at particularly offensive conduct," and that "[t]he instinct for retribution is part of the nature of man, and channeling that instinct in

the decision that capital punishment may be the appropriate sanction *in extreme cases* is an expression of *the community's belief* that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death." *Gregg v. Georgia, id.,* at 184 [96 S.Ct. at 2930] (footnote omitted) (emphasis added). Here again, jury involvement in capital sentencing is necessary to ensure as a general matter that the death penalty properly reflects the attitude of society toward a given class of crime. But as the same plurality noted on the same day in *Woodson v. North Carolina, supra* 428 U.S. at 304 [96 S.Ct. at 2991], "the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of *the character and record of the individual offender and the circumstances of the particular offense* as a constitutionally indispensable part of the process of inflicting the penalty of death." (emphasis added). Thus, a prevailing social belief in retribution must justify not only the *general* permissibility of the death penalty but also the infliction of the death sentence in particular cases. In this regard, the jury is indispensable in ensuring that society does indeed seek retribution against the particular defendant: "[A] jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." *Witherspoon v. Illinois, supra,* 391 U.S. at 519–20 [88 S.Ct. at 1775–1776].

### Q. JUDGES ALONE CANNOT ADEQUATELY REFLECT COMMUNITY VALUES IN THE SENTENCING PROCESS

The "qualitative difference between death and other penalties calls for a greater degree of *reliability* when the death sentence is imposed." *Lockett v. Ohio, supra,*

438 U.S. at 604 [98 S.Ct. at 2964] (plurality opinion) (emphasis added). A death penalty procedure is unconstitutional if it is so unreliable that it "creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Id.* at 605 [98 S.Ct. at 2965]. Since the Court has held that death sentences must comport with the community's sense of evolving standards of decency and its legitimate desire for moral retribution, an essential question is whether judges alone can *reliably* reflect the communal values that are the source of the constitutionality of capital punishment.

By definition, juries, not judges, are "the cross-section of the community," reflecting community values. *Duren v. Missouri,* 439 U.S. 357, 359 [99 S.Ct. 664, 666, 58 L.Ed.2d 579] (1979). Only a representative jury assures "meaningful community participation." *Ballew v. Georgia,* 435 U.S. 223, 235 [98 S.Ct. 1029, 1036, 55 L.Ed.2d 234] (1978) (plurality opinion). Jurors, unlike judges, are selected to enhance the likelihood that they represent the whole range of community beliefs and backgrounds, *Taylor v. Louisiana,* 419 U.S. 522, 531–33 [95 S.Ct. 692, 698–699, 42 L.Ed.2d 690] (1975); the different segments of the community bring to the representative jury "perspectives and values that influence both jury deliberation and result," *id,* at 532 n. 12 [95 S.Ct. at 698 n. 12]. *See Humphrey v. Cady,* 405 U.S. 504, 509 [92 S.Ct. 1048, 1052, 31 L.Ed.2d 394] (1972). Moreover the sheer difference in size between a twelve-member jury panel and a single judge may bear significantly on the validity of a sentencing decision under the Eighth Amendment. Canvassing expert empirical studies, the United States Supreme Court has concluded that the likelihood that a decision in a criminal case correctly applies "the common sense of the community to the facts" increases with the number of decisionmakers. *Ballew v. Georgia, supra,* 435 U.S. at 232 [98 S.Ct. at

the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law' " *Gregg v. Georgia,* 428 U.S. 153, 183 [96 S.Ct. 2909, 2929, 49

L.Ed.2d 859] (1976) (plurality opinion), quoting *Furman v. Georgia,* 408 U.S., at 308 [92 S.Ct., at 2761] (Stewart, J., concurring).

1035].[30] Twelve individuals are obviously more likely to reflect the prevailing views of society than one person.[31]

A jury need not engage in questionable speculation to determine what community sentiment would say in a particular case. Its very function is to bespeak that community sentiment by exercising its own judgment. The jury's response *is* society's response. *Witherspoon v. Illinois, supra,* 391 U.S. at 519–20 [88 S.Ct. at 1775–1776]. "The jury ... is a significant and reliable objective index of contemporary values because it is so directly involved," *Gregg v. Georgia, supra,* 428 U.S. at 181 [96 S.Ct. at 2928]. By contrast, judges cannot themselves speak for community sentiment. If they are to fulfill the demands of the Eighth Amendment by bringing evolving standards of decency and principles of retribution to bear in a capital punishment case, they can do so only indirectly since

"[C]ourts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits." *Dennis v. United States,* 341 U.S. 494, 525 [71 S.Ct. 857, 875, 95 L.Ed. 1137] (1951) (Frankfurter, J., concurring). Unable to represent community sentiment, a judge must undertake to ascertain it. That is necessarily a difficult task,[32] made even more difficult because judges—whether considered in terms of race, sex, or economic class—do not reflect the wide range of backgrounds or beliefs within the community.[33] "[T]he reluctance of juries in many cases to impose the sentence [of death] may well reflect the humane feeling that this most irrevocable sanction should be reserved for a small number of extreme cases," *Gregg v. Georgia, supra,* 428 U.S. at 182 [96 S.Ct. at 2929]. For a variety of reasons, judges appear less likely to reflect that same reluctance.[34]

**30.** *Ballew* also amassed considerable empirical evidence to prove that reducing the number of decisionmakers in a criminal case impairs the accuracy, fairness, thoroughness and consistency of the decision, generally to the detriment of the defendant. *Ballew v. Georgia,* 435 U.S. 223, 232–39 [98 S.Ct. 1029, 1035–1038, 55 L.Ed.2d 234] (1978) (plurality opinion).

**31.** Significantly, every state authorizing jury involvement in capital sentencing appears to require a jury of twelve persons. Gillers, *supra* note 22, at 63 n. 298.

**32.** Judges may theoretically have access to community sentiment through social contact, as well as through such sources as polls, editorials, journals, and newspaper reports. Cook, *Public Opinion and Federal Judicial Policy,* 21 *Am.J.Pol.Sci.* 567, 576 (1977). Unfortunately, these sources greatly overstate the willingness of members of the community to impose the death penalty on specific defendants for specific crimes. Research on jury behavior reveals that jurors are substantially more lenient when trying an actual case and sitting through deliberations than they will otherwise indicate. Zeisel & Diamond, *The Effect of Peremptory Challenges on Jury and Verdict: An Experiment in a Federal District Court,* 30 *Stan.L.Rev.* 491 511–12 (1978) (shadow juries drawn randomly and not subject to peremptory challenges vote guilty far more often than real juries; probably because the defendant's liberty was not in their hands). People who favor the death penalty in the abstract are more

lenient when presented with descriptions of actual cases.

**33.** As of 1979 judges in state courts of general trial jurisdiction earned salaries ranging from $24,400 in Oklahoma to $54,205 in California, with a mean of approximately $41,000. Nat'l Center for St. Cts., Survey of Judicial Salaries 1 (Sept. 1979). As of 1977 in these general jurisdiction courts, only 2.5 percent of the 5,155 judges were women, and 20 states had no women at all on these courts. Cook, *Women Judges: The End of Tokenism,* in *Women in the Courts,* 84, 87–88 (Nat'l Center for St. Cts. 1978). It appears that as of 1977 only 2.6 percent of the judges on these general trial courts were black. G.W. Crockett, Number and Distribution of Black Judges (March 1977) (unpublished charts on file with Nat'l Center for St. Cts.). Finally, the rigorous educational requirements for admission to the bar make it inevitable that the average educational attainment of judges will far exceed that of the community in general.

**34.** Kalven and Zeisel's classic report shows that judges and juries disagree in a substantial number of cases. In a study of 3576 trials, judge and jury reached the same decision about a criminal defendant only 72 percent of the time. H. Kalven & H. Zeisel, *supra* note 27, at 68. In their specific study of the death penalty, the authors report that judge and jury disagreed about the imposition of a death sentence in 19 percent of the cases, *id.,* at 436. To view the results yet another way, in those cases

As a means of reliably reflecting community sentiment on capital punishment, bringing lay jurors into the sentencing process " 'places the real direction of society in the hands of the governed . . . and not in . . . the government.' " Powell, *Jury Trial of Crimes*, 23 *Wash. & Lee L.Rev.* 1, 5 (1966) quoting *De Tocqueville, Democracy in America* 282 (Reeve Tran.1948). Quintessentially, the right to a jury "is granted to criminal defendants in order to prevent oppression by the government," *Duncan v. Louisiana*, 391 U.S. 145, 155 [88 S.Ct. 1444, 1450, 20 L.Ed.2d 491] (1968), and to protect against "arbitrary action" by the complaint, biased, or eccentric judge. *Id.,* at 156 [88 S.Ct. at 1451]. It "reflects a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizens to one judge or to a group of judges." *Ibid.*[35]

where one or both recommended death, judge and jury disagreed 60 percent of the time. In those cases in which either the judge or jury or both would have voted for the death penalty, in 40 percent, judge and jury agreed, and in 40 percent only the judge would have voted for the death penalty, yet in only 20 percent of the cases would the jury but not the judge vote for execution. Thus, the juries were essentially twice as lenient as the judges. *Ibid.* As a United Nations Report concludes:

"[A]mong the leading authorities in penal science, the supporters of abolition appreciably outnumber those who favour the retention of capital punishment. The specialists of the social sciences, penologists, doctors and writers on social science or criminology are, in their great majority, abolitionists. The supporters of capital punishment, apart from a number of political figures and persons holding high public office, are generally jurists with a traditional training and judges."

United Nations, Dept. of Economic and Social Affairs, Capital Punishment (ST/SOA/SD/9–10–64 (1968).

The reason for these differences may lie in the greater reluctance of judges to depart from what they perceive to be the letter of the law. *See, e.g., Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869 [71 L.Ed.2d 1] (1982). Kalven and Zeisel discovered in more than one judge "a kind of envy of the freedom of the jury to reach a decision which he as a judge could not reach" *Kalven & Zeisel, supra,* at 428. The judge's role as a strict enforcer even restricts his discretion in sentencing decisions where that discretion would seem to be wholly lawful. As one judge said of draft evasion cases: "I am opposed to conscription. I also believe that the war in Vietnam is both immoral and impractical. My sentencing policies are based upon the fact that as long as law exists, it should be imposed to effectuate its intent and purpose." Cook, *Sentencing Behavior of Federal Judges: Draft Cases—1972,* 42 *Cinn.L.Rev.* 597, 623 (1973). At the same time, Cook's study also reveals that as judges (unlike individual jurors) accrue experience in a given type of case, their sentencing settles into distinct and regular patterns of severity or leniency, *id.,* at 602–03, so

that the judge's first decision whether a person lives or dies may inspire far more deliberation and consideration than subsequent decisions. For individual jurors, however, the gravity with which they approach their decisions in capital cases will rarely be affected by such routinization.

Florida studies cited in Gillers, *supra* note 22, at 67–68 n. 318, report that sentencing judges were significantly more inclined to impose death than the juries that recommended sentences to them. The studies also show that the judges' decisions seem to correlate with the race, sex, and social background of the defendant and victim, while the juries showed no evidence of any such biases.

**35.** The *Proffitt* plurality's speculation that "judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury and therefore is better able to impose sentences similar to those imposed in analogous cases," *Proffitt v. Florida, supra,* note 25, 428 U.S., at 252 [96 S.Ct., at 2966], must, of course, be read in the context in which it was made: as a statement of the probable result of the Florida system in which an advisory jury sentence may be mitigated at the discretion of the trial judge, or increased from life imprisonment to death only where a life sentence would be manifestly unreasonable. *Id.,* at 249–50 [96 S.Ct. at 2965–2966]; *See,* note 25, *supra.* Moreover, empirical evidence suggests that individual state trial judges are not likely to achieve consistency among death sentences meted out across the state. Gillers, *supra* note 22, at 58–59; Cook, *supra* note 32, at 623. Rather the state can better take advantage of the purported ability of judges to ensure consistency in capital sentencing, at no cost to the defendant's right to jury sentencing, by relying on the automatic appeal procedure by which this Court must review each death sentence in comparison to other cases involving similar crimes or defendants. I.C. § 19–2827. *See, Gregg v. Georgia,* 428 U.S., at 204–06 [96 S.Ct., at 2939–2940]; *id.,* at 211–12, [96 S.Ct. at 2942–2943] (White, J., concurring).

These concerns are even more compelling where life stands immediately in the balance.

BISTLINE, Justice, dissenting.

## PART I

### CONSTITUTIONAL RIGHT TO JURY

Travesty. Such is my view of a majority opinion which chooses to answer a dissenting view by ignoring it. In the ordinary case it is pretty much a matter of choice to disdain comment on a contrary view, but in a death sentence case it is a travesty, and especially is this so where this Court can as a collegial group not only ascertain and apply precedent, but add saving graces to legislative enactments.

In this year of 1983, as to the constitutional right to have a jury make the determination between life and death, the majority contentedly declares that "At other places or at other times juries have been given an integral rule in imposing the death sentence." "Other times" are in most recent times. Since creation of Territorial Idaho in 1863 and passage of the 1864 Criminal Practice Act, and continuing through the time of Idaho's admittance to the Union in 1890 and until 1973 when the first post-*Furman* legislature thought it was by *Furman* required to provide an automatic death penalty on every first degree murder conviction, death sentencing was a jury determination. The accused participated in the selection of the jury who would determine his fate. That has purportedly been taken away from the convicted murder, and his fate falls to one solitary person—who, if it were to be known, would undoubtedly rather see the question back where it always

was—with a jury of twelve. This has been well documented in the dissenting opinion of Justice Huntley wherein on the strength of history and precedent he illustrates that for over 110 years it was the jury who made the decision of death or life. His assertion that the right of an accused to have a jury impose the sentence of death flows from the Idaho Constitution is beyond conscionable dispute. A majority of the Court, obviously unable to mount a tenable attack on that assertion, say only that that elimination of the jury function is a mere matter "of the legislative policy,"—from which point their opinion quickly digresses into an exaltation of the common qualities of Idaho trial judges who, unlike their federal counterparts, realize "that their positions are anything but lifetime sinecures." A position of vulnerability to popular emotions is not necessarily a plus.

Having joined Justice Huntley's opinion, there is little reason for further espousing that which he had laid before the majority. But, having read in the majority opinion that they have "conducted an extensive and thorough review of Idaho murder cases," I, too, have deemed it appropriate to review those cases listed in footnote 2 of the majority opinion, and I have gone back to include in my survey some of those early cases which wholly substantiate Justice Huntley's declaration that it was ever, both prior to statehood and afterward, clearly the right of the people and of the accused to have a jury determination.

In *People v. Walters*, 1 Idaho 271 (1869), the defendant was charged with murder in the first degree. The jury, knowing that a first degree conviction required execution, recommended the mercy of the Court.

We the Jurors in the above entitled cause find the Deft guilty as charged in the Indictment and recommend him to the mercy of the court

L Jackson
Foreman of Jury

Notwithstanding the jury's recommendation, the Court followed the mandate of the law.

The Judgment of this court and the Sentence of the Law is, That you Simeon Nally are to be taken from hence to the Prison from which you came and from thence to the place of Execution and there on Wednesday the 12th day of May next between the hours of twelve at noon and six o'clock in the afternoon, You are to be hanged by your neck until you are dead,

And may God whose Laws you have broken, have mercy on your soul.

Thos J Somers
Mint Judge

Attest
H Street Clk
By J N Wickenham
Deputy

In 1870 a territorial jury convicted the defendant of first degree murder, and accordingly he was executed. *People v. Ah Choy*, 1 Idaho 317 (1870). In 1874 another territorial jury convicted another defendant of first degree murder, and he, too, suffered judgment of death. *People v. Waters*, 1 Idaho 560 (1874). Three years later four defendants charged with first degree murder escaped the noose upon jury convictions of second degree murder. *People v. Ah Hop, Yung Sing, Ah Pong, and Hung Chu.* 1 Idaho 698 (1878).

In 1877 the territorial legislature in recodifying statutory law, revised the statute declaring the penalty for murder to read as it did until a 1919 amendment, other than for designation of the "Territorial Prison" instead of "State Prison." In 1901, in enacting the Idaho Code Annotated, following admission to the Union, the language was then changed to "State Prison"—but all this time there was no change in the penalty for first degree murder, which was death, and it was mandatory.

So, in the transition from territory to statehood, although the typewriter had by then replaced the pen, it was still the jury that made the determination. Conviction of first degree murder meant death. A jury not so disposed could circumvent the death penalty only by returning a verdict of guilty of second degree murder. Thus, in *State v. Perry*, 4 Idaho 224, 38 P. 655 (1894), following admission into the Union, the jury's verdict was:

"We, the jury in the above entitled action, find the defendant guilty of murder of the first degree.

H.L. Beeroft, Foreman."

And, as before statehood, the penalty was death:

" 'That, whereas, the said Charles Perry, having been duly convicted of the crime of murder of the first degree;

" 'It is therefore ordered, adjudged and decreed that the said Charles Perry be taken from this Courtroom to the County

Jail of this, Bannock County, State of Idaho, and that he be there held until the 28th day of September, A.D., 1894, and that upon said day, between the hours of nine o'clock A.M., and four o'clock P.M., within the walls of said jail, or at some convenient private place within the said Bannock County, and in the manner made and provided by the Statutes of this State in such case, he, the said Charles Perry, be hung by the neck until he is dead.' And the Sheriff of Bannock County, Idaho, is hereby directed to enforce the execution of this judgment. D.W. Standrod, Judge."

In 1911 the statute governing the penalty for first degree murder was changed to read as it continued to read until amended after *Furman*. The penalty now became either death or life imprisonment, and the jury continued to make that decision. Had it so read in 1864, with discretion in the jury, Simeon Walters would not have been executed. In 1910, Fred Gruber, too, was executed, the last person whose fate was decided by a jury which had no discretion where it did render a verdict of murder in the first degree. The jury's verdict in Gruber's case:

"We, the jury, duly empaneled and sworn to try the above entitled cause, for our verdict say:

"That we find the defendant, Fred Gruber, guilty of the crime of murder of the first degree as charged in the information.

T.J. McAndrew, Foreman."

The judgment of the Court:

"that the said defendant, Fred Gruber, be taken hence to the County Jail of the County of Kootenai, State of Idaho, and from there forthwith conveyed and taken to the State Penitentiary of the State of Idaho, in the County of Ada, State of Idaho, and that on the 20th day of May, A.D. 1910, between the hours of eight o'clock in the forenoon and two o'clock in

the afternoon of said day, within the walls of the said State Penitentiary of the State of Idaho, the said defendant, Fred Gruber shall by the warden of the State Penitentiary of the State of Idaho, be hanged by the neck until he, the said Fred Gruber shall be dead, and may the Lord have mercy on your soul."

The Gruber execution may have been unpopular. At any rate, the next legislature amended the statute to provide that the jury could decide between punishment by death or by life imprisonment.[1] The statute remained unchanged until after *Furman,* and it is helpful to note the manner in which the jury continued to administer its sentencing function as part and parcel of the defendant's right to such determination.

Vicente Ramirez appears to be the first defendant convicted of first degree murder after the jury was given the alternative between a life sentence of death. In his case, in their own language the jurors fixed his penalty at execution. *State v. Ramirez,* 33 Idaho 803, 199 P. 376 (1921).[2] The jury did not do so with his co-defendant whom they also convicted of first degree murder.

*State v. Hoagland,* reviewed in the majority's survey, was tried in early 1923. The jury's verdict:

"We, the jury, duly sworn and empanelled in the above entitled cause, find the defendant David L. Hoagland guilty of murder in the first degree, as charged in the information, and fix the penalty at death.

J.W. Pottenger, Foreman."

In accordance therewith he was executed.

Other first degree murder verdicts after 1911 in cases cited in the majority's review are, in inverse order, but in chronological order forward:

"We, the jury, duly impanelled and sworn to try the above entitled cause, for our verdict say that we find the defendant guilty of the crime of murder in the first degree, as charged in the information on file herein, and fix his punishment as imprisonment in the State prison for life.

J.A. Stoner, Foreman."

*State v. Redding [Reding],* 52 Idaho 260, 13 P.2d 253 (1932).

"We, the jury, empanelled in the above entitled cause, find the defendant, Douglas Van Vlack, guilty of murder in the first degree, as charged in the information, and fix his punishment at death.

W.S. McGowen, Foreman."

*State v. Van Vlack,* 57 Idaho 316, 65 P.2d 736 (1936).

"We, the Jury in the above entitled cause, find the defendant, Ralph Golden, guilty of murder of the first degree, and we decide that the punishment to be inflicted shall be imprisonment in the state prison for life.

Fay H. Rose, Foreman."

*State v. Golden,* 67 Idaho 497, 186 P.2d 485 (1947).

"We, the jury in the above entitled cause, find the defendant William Lawrence Owen guilty of murder of the first degree. We decide that the punishment to be inflicted shall be death.

D.L. BUSH, Foreman."

*State v. Owen,* 73 Idaho 394, 253 P.2d [203] 394 (1953).

"We, the jury in the above entitled action, find the defendant Robert Clokey GUILTY OF MURDER OF THE FIRST DEGREE, as charged in the Information, and recommend as punishment therefor the DEATH PENALTY.

Chet Moulton, Foreman."

1. The statute as amended in 1911 is set forth in the opinion of Justice Huntley.

2. This is not the same opinion as that cited in the majority's survey, *State v. Ramirez,* 34 Idaho 623, 203 P. 279 (1921).

*State v. Clokey,* 83 Idaho 322, 364 P.2d 159 (1961).

"WE, THE JURY, duly impaneled in the above-entitled action, find the defendant Guilty of Murder of the First Degree, and fix the punishment as imprisonment in the State Prison for life.

 JAMES F. CAREY, Foreman."

*State v. Gonzales,* 92 Idaho 152, 438 P.2d 897 (1968).

"We, the Jury in the above entitled case, find the defendant guilty of Murder in the First Degree as charged in the Information.

"We further find that the defendant shall be punished by imprisonment in the Idaho State Penitentiary for life.

 James W. Buckley"

*State v. Foley,* 95 Idaho 222, 506 P.2d 119 (1973).

*State v. Foley,* involving a pre-*Furman* crime, appears to have been the last murder case where the jury had the discretion to decide between life imprisonment or death. *Furman* then intervened, following which the legislature returned to the law as it was prior to 1911—a mandatory death penalty upon conviction of first degree murder. As pointed out in the majority opinion, some death sentences were imposed, but were set aside upon the authority of *Woodson v. North Carolina,* 428 U.S. 280 [96 S.Ct. 2978, 49 L.Ed.2d 944] (1976). The legislature responded by returning to the law as it was following the 1911 amendment. The penalty was set at either death, or, imprisonment for life. I.C. § 18–4004 as amended by Ch. 154, § 3, Sess. Laws 1977. The legislature,

however, was unmindful of the constitutional right to a jury determination, and passed the Act as presented to it by the attorney general.[3]

Since the passage of the 1977 Act the Court has received eight appeals from imposed death sentences. The case now before us is the second. The first was *State v. Osborn,* 102 Idaho 405, 631 P.2d 18 (1981), wherein Osborn's judge-imposed sentence, as per the 1977 Act, was reversed and the cause remanded for resentencing in accordance with the views expressed in the Court's opinion—an opinion which I did not join. The district court, the Honorable Arthur P. Oliver, flatly refused to again consider the imposition of a death penalty, for reasons which I shall shortly lay out and discuss. The attorney general acquiesced in the district court's refusal by not challenging it, and in that first application of the 1977 Death Penalty Act, precedent has been set which strongly suggests the desirability of the pre-*Furman* statute which placed the death or life determination upon the shoulders of twelve jurors.

*Osborn,* after initially pleading not guilty, moved the trial court to withdraw that plea, and enter a plea of guilty to first degree murder. His attorney did not at any time, either in the trial court or on the appeal, express any thought that Osborn was constitutionally entitled to a jury determination as to his guilt, and, if guilty, then as to his fate. Hence there was no consideration of that issue in the *Osborn* opinions. The right to jury involvement at sentencing has been raised for the first time in this case, and even as I pen my views, counsel for Mr. Creech has filed in this Court a motion for an order vacating the sentence and judg-

---

3. At oral argument in this case we were advised by the Honorable Lynn Thomas, Solicitor General for the State of Idaho, that the 1977 Act was attributable to his personal efforts. Justice Huntley has pointed out in his opinion that the statement of purpose clearly, but erroneously, misled the legislature into the belief that enactment of the bill as presented was mandated by the United States Supreme Court. I very much doubt that there was any intentional thought directed toward omitting the jury function. In other cases the solicitor general has been adamant that, until a 1982 constitutional amendment, the right of jury trial in felony cases was mandatory and could not be waived by a defendant, with or without the State's consent. *State v. Hightower,* 101 Idaho 749, 620 P.2d 783 (1980); *State v. Davis,* 661 P.2d 308 (Idaho 1983).

ment herein, and at the same time moving this Court to allow him to withdraw his guilty plea.[4]

Concluding my views on the constitutionality of the present statutory scheme under which Mr. Creech was sentenced to death without proper regard for the Idaho Constitution which declares in Article I, Declaration of Rights, that "The right to trial by jury shall remain inviolate, . . ." § 7 (the major portion of which deals with criminal actions), I pause to say that I, as one person, and most likely Mr. Creech and his counsel as others interested, would be grateful in the extreme were the majority to, in their opinion, explain the error they find in Justice Huntley's proposition that:

"The provisions of the constitution pertaining to the right to trial by jury are construed to apply as it existed *at the date of the adoption of the constitution.*"

Justice Huntley did not create and then advocate the proposition, but rather simply stated it as a well-entrenched principle in our Idaho jurisprudence. To my understanding it is a general rule recognized in all jurisdictions.

If that were not enough persuasion to at least evoke a response from the majority, there is also the teaching of *State v. Miles,* 43 Idaho 46, 248 P. 442 (1926) where a unanimous Court, a bare 36 years after statehood, stated:

"The rule is well established that the guaranty of right of trial by jury secures that right as it existed under the common law and territorial statutes in force at the date of the adoption of our Constitution." 43 Idaho at 49, 248 P. at 442 (citations mooted).

The proposition involved had been earlier examined in an opinion by Justice Ailshie, regarded by many as Idaho's foremost Justice, in a case wherein it was contended by the attorney general that the Board of Pardons, as established in the 1899 Constitu-

tion, could "impose any conditions whatever upon the granting of a parole." Art. 4, § 7 (since amended). In passing on the question presented, the Court observed the delineations of governmental power;

"There can be no doubt but that, under the Constitution and statute as above cited, the board of pardons may, upon the granting of a pardon, commutation or parole, attach such conditions as they see fit, so long as they are not immoral, illegal or impossible of performance, provided they are to be kept and performed or complied with during the term for which the prisoner was sentenced by the judgment of the court. Under our Constitution it is the duty and prerogative of the legislative department to define crimes and fix the maximum and minimum penalty that may be imposed for the commission thereof. *It is the duty of the judicial department to try offenders against those laws, and, upon conviction, to sentence them under the statute. Under the laws of this state, there is no such thing as an indefinite or indeterminate sentence* as is provided for in many of the states from which authorities have been cited by the Attorney General. *In this state the sentence and judgment of the court must be specific, certain, and definite.* The board of pardons belongs to the executive department of the state, and its privilege and prerogative is that of granting clemency. It is a board of clemency, rather than a punitive body. Instead of pronouncing judgment and sentence, and imposing punishment, its prerogative and authority is that of forgiving offenses and remitting penalties, wiping out judgments and sentences of conviction either in whole or in part." (Emphasis added.) *In re Prout,* 12 Idaho 494, 498–99, 86 P. 275, 276 (1906).

In the interim between *Prout* (1906) and *Miles* (1926), there was yet another case, *In re Dawson,* 20 Idaho [178] 180, 117 P. 696 (1911), wherein our predecessors on this

---

4. Prior to receipt of this motion I have already written one portion of this dissent wherein the procedure whereby Mr. Creech was allowed to enter a guilty plea against the advice of counsel comes under discussion. To that I will presently turn.

Court again paused to dwell upon our criminal justice system and the function of a jury under the Idaho Constitution. It was not a capital case, but a felony charge of larceny, to which the defendant pleaded guilty five days after he was charged, whereupon he was sentenced to the penitentiary—wherefrom by habeas corpus petition he sought his release on two grounds, one of which was that the right to jury trial provision found in the Idaho Constitution precluded the court's jurisdiction to commit him to the penitentiary on a guilty plea. In passing upon that contention, the Court made these observations:

"The language used in sec. 7 of article 1 of the Constitution was no doubt intended to preserve to the citizens of the state the right of trial by jury *as it existed under the common law,* and such right is retained in all cases which were triable by jury at common law .... '[W]herever a right to this trial is guaranteed by the Constitution without qualification or restriction, it must be understood as retained in all those cases which are triable by jury at common law, and *with all the common-law incidents to a jury trial so far at least as they can be regarded as tending to the protection of the accused.'* "

*Id.* at 182, 117 P. at 697 (quoting Cooley, Constitutional Limitations, 7th ed., p. 453) (emphasis added).

The Court in *Dawson* further elaborated that:

"[T]he right of every one to have his cause tried or to be tried himself if accused of crime by a jury is guaranteed and established beyond the power of the Legislature to abridge it.... 'The trial by jury, secured to the subject by the Constitution, is a trial according to the course of the common law, and *the same, in substance, as that which was in use when the Constitution was formed.'* "

*Id.* at 184, 117 P. at 698 (quoting *East Kingston v. Towle,* 48 N.H. [57].64) (emphasis added).

It is clear, then, that the right to trial by jury must be examined in light of the prac-tices at common law and the statutes of Idaho when our constitution was adopted and approved by the citizens of Idaho. In territorial Idaho and in statehood until 1911, as at common law, the uniform practice was to make death the exclusive and mandatory sentence for certain specified offenses. *Woodson v. North Carolina,* [428 U.S. 280], 96 S.Ct. 2978, 2983 [49 L.Ed.2d 944] (1976) (citing H. Bedau, The Death Penalty in America, 5–6, 15, 27–28 (rev. ed. 1967)). A jury in the Territory of Idaho by convicting a person of first degree murder therefore also determined the punishment to be imposed—death. The judge's role was merely to pronounce the judgment, a matter in which he had no discretion. Such was the statutory law since 1864, and even with some non-capital cases, the legislature placed "a duty upon the court ... to impose the punishment prescribed." R.S. 1877, § 6306—now I.C. § 18–106. (*See In re Erickson,* 44 Idaho 713, 260 P. 160 (1927).) Idaho followed the common-law practice of giving the jury the role of sentencer in capital cases—the jury being statutorily given the exclusive power to determine when the death penalty would be imposed. As has been seen, Section 17 of the Idaho Criminal Practice Act of 1864, set forth in Justice Huntley's dissent, provided that:

"[T]he *jury* before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, *designate by their verdict, whether it be murder of the first or second degree; ...* Every person convicted of murder of the first degree, *shall suffer death;* and every person convicted of murder in the second degree, shall suffer imprisonment in the territorial prison for a term not less than ten years, and which may be extended to life." (Emphasis added.)

In 1887, a mere three years before the Idaho Constitution was adopted and approved, the Idaho Revised Statutes provided that:

"Sec. 6563. Every person guilty of murder in the first degree *shall suffer death,* and every person guilty of murder in the second degree is punishable by

imprisonment in the Territorial prison not less than ten years, and the imprisonment may extend to life."

Idaho Revised Statutes, Title VII, ch. 1, § 6563 (emphasis added).

At that same time the trial jury's function was set out thus:

"Sec. 3938. A trial jury . . . is a body of men . . . sworn to *try and determine by a unanimous verdict a question of fact.*"

Idaho Revised Statutes, Title VII, ch. 1, § 3938. (Emphasis added.)

It was a question of fact whether a person was guilty of murder in the first or the second degree. This determination could only be made by a jury and it could only be made by a unanimous jury. Since the time the Territory was created, it took a unanimous vote of twelve jurors to determine that a person was to die.

The 1887 Revised Statutes of the Territory specifically distinguished between those cases in which the judge could exercise his discretion in meting out punishment and those in which the punishment was determined by the jury as a result of its verdict of guilty for a specified crime.[5] *See* R.S. 1877, §§ 6306, 6307 (now I.C. §§ 18-106, 18-107. R.S. 6307 was amplified by R.S. 7992.)

"Sec. 7992. After a plea or verdict of guilty, *where a discretion is conferred upon the court, as to the extent of the punishment,* the court, upon the oral suggestion of either party that there are circumstances which may be properly taken into view either in aggravation or mitigation of the punishment, may, in its discretion, hear the same summarily, at a specified time, and upon such notice to the adverse party as it may direct." (Emphasis added.)

Now I.C. § 19-2515 (amended in 1977.)

The common-law practice of England, and the practice codified in 1864 and 1887, of requiring jurors to determine whether a sufficient crime was committed to warrant the imposition of the death penalty, was preserved by the Idaho Constitution, art. 1 § 7 and also by art. 21, § 2, as readily confirmed by reading the Proceedings of the Idaho Constitutional Convention.

The Proceedings of the Constitutional Convention revolving around art. 1 § 7 shed further insight as to the intent of the framers, leaving no doubt as to the verity of the above statements of the Court in *Miles, Prout,* and *Dawson.* It was proposed by Mr. Claggett that a verdict could be rendered by a majority of ⅚ of the jurors "in *all* criminal actions except where the death penalty is imposed by law." Idaho Constitutional Convention Proceedings and Debates, p. 151. The framers rejected his proposal and ultimately adopted the provision now in force which allows for less than unanimous verdicts only in non-felony cases.

In reviewing their recorded considerations of that issue, we are fortunate today to have irrefutable evidence that those public leaders, of whom nearly one-half were practicing lawyers (Vol. I, Idaho Constitutional Convention, p. 160), were acutely aware that § 7 of Article I would guarantee forever that the legislature could not impinge upon the right of an accused to have a jury of his fellow men make the death penalty decision. Mr. Heyburn said it with an eloquence befitting a Thomas Jefferson or a James Madison:

"Mr. Chairman, I cannot agree with the gentleman in regard to the wisdom of changing entirely the system that is as old as government itself, *that no man shall be deprived of his rights, of his liberty or his life, except by a unanimous verdict of a jury of his fellow citizens who have no interest other than to see that justice is done him.* This principle has been deemed so important that at one time the demand that man should be protected by right of trial by jury revolutionized the civilized world. . . . It is the strong arm of the law that stands between the weak and the strong, between

---

**5.** To my reading of the 1887 Penal Code, capital offenses were the only offenses in which the sentencing discretion rested not with the court but with the jury.

rich and poor, between oppressed and oppressor. . . . [I]t is still not necessary for us to say that less than a unanimous verdict shall deprive any man of either his liberty or his personal rights. *We cannot afford in the interest of economy nor in the interest of speedy justice—or of speedy trial, more properly speaking— to lessen by one hair's breadth the safeguard, the insurance every man has that his property or his rights will not be taken away from him, unless it is clear, beyond a reasonable doubt that they do not belong to him, and that that reasonable doubt is to be determined by a unanimous verdict."

*Id.* at 152–53 (emphasis added).

Although Mr. Claggett, the sponsor of the proposed ⅚ majority rule proposal contended that the requirement of unanimous verdicts in criminal cases paralyzed the law enforcement power of the state, even he recognized that capital cases are unique:

"MR. CLAGGETT. . . . We all know the defendant has every benefit from reasonable doubt. We all know he has a double advantage in impaneling the jury. We all know that when there has once been a verdict of acquittal he cannot be called in question again, no matter how wrong the verdict may be. And we all know in addition that the court has power to suspend judgment on the verdict after conviction, in order that application may be made to the governor for pardon in any case which may arise now and then, where the conviction is wrong, or where, if not wrong, the punishment is too severe, so that there is ample opportunity given before the execution of the judgment of the court for a review of the case by the governor or board of pardons. Now I ask whether all these things taken together, one and all, do not constitute too much advantage on the part of the defendant, and whether the strong arm of the state, which is stretched out and whose function is to protect the people, is not paralyzed by this system of a unanimous verdict.

"Mr. BATTEN. I will ask you, why make an exception in capital cases?

"Mr. CLAGGETT. Out of mere tenderness to human life, and because *if the death penalty is once inflicted you can never rectify the error,* but on the question of imprisonment you have the entire term of his imprisonment to correct it."

*Id.* at 251 (emphasis added).

. . . .

"Mr. AINSLIE . . . I say it is legitimate in civil proceedings that a jury of three-fourths should find a verdict. I believe it will facilitate litigation and dispatch many suits a great deal quicker than by having a unanimous verdict. But when we come to the life and liberty of the citizen, whether it means imprisonment in the county jail or ninety and nine years in the penitentiary, I say we should pause and be governed to a large extent by the experience of those who have gone before us. . . . [A]nd *you will find that they have never yet undertaken to advocate the doctrine that five-sixths of a jury should find a verdict in a criminal case.* Therefore I oppose the motion made by the gentleman from Shoshone, and I hope this body will not adopt it." *Id.* at 258.

Clearly the right, indeed the safeguard, to have a jury of fellow citizens make the decision of death was foremost in the minds of the framers when they assembled in the year 1899 and drafted the Constitution of Idaho which was accepted by the people and the Union.

From 1864 until 1977 imposition of the death penalty in Idaho has *not* been a function of trial judges. During that period of time the legislature set the penalty and the judge merely pronounced judgment accordingly. If the jury returned a verdict of guilty of first degree murder, the judge was under a duty to pronounce a judgment that the defendant suffer the death penalty. This is exemplified nicely in *People v. Walters, supra,* where the Territorial judgment on the verdict of guilty of first degree murder stated "The Judgment of this court and *the sentence of the law* is . . ." Nor was there any room for discretion in the

court. Although the Revised Statutes of 1877 § 639 provided for an aggravation-mitigation hearing, it had no applicability where the verdict in a first degree murder case was guilty of first degree murder. Obviously that procedure would not have withstood scrutiny under decisions of the United States Supreme Court which were handed down in 1972 and 1977.

A forerunner in many areas of criminal law, in 1911 the legislature did give the jury some leeway in capital sentencing, and from that time on until the legislature acted again in 1972, the jury, as a component part of the court (see State v. Ramirez, 34 Idaho 623, 203 P. 279 (1921),

> "the jury, in a case triable by a jury, is as much a part of the court as the judge. Each has certain legal duties and functions, and the combined action of the jury and the judge makes up and merges in the final judgment. *The action of the jury in imposing the death penalty merged in the judgment and became a part of the decision of the court.*" (Emphasis added.)

34 Idaho at 634, 203 P. at 283.

became vested with the same discretion that judges had in non-capital cases where the legislature had not set a mandatory penalty. So, and as has been now well pointed out, from and after 1911 the jury, upon convicting a defendant of first degree murder would decide between imposing a sentence of death or a sentence of life imprisonment. Done away with, at that early time, then, was the mandatory death sentence which would over fifty years later in the seventh decade of the twentieth century be held offensive as violative of the Constitution of the United States.

Becoming then applicable were those provisions enacted in 1877 and now codified as I.C. § 19–2515(a), which, prior to 1977 read exactly as it had read for 110 years, and provided for the presentation of evidence on circumstances both mitigation or aggravation of the punishment. In this manner the Idaho procedure governing the death penalty had all of the requisite features which the Supreme Court of the United States would later require—other than, perhaps guidelines.

But even there, although the legislature did nothing toward providing criteria for the juries to consider in deciding between life sentences and death sentences, the courts of Idaho were not remiss.

Time constraints in meeting the rules of this Court for issuing opinions—with death penalty cases in no way distinguished from run-of-the-mill monetary judgments in small claims court—prevent an exhaustive review, but suffice it to say that my personal knowledge is that trial judges in Idaho have properly instructed the jury. An example which is preserved in our Idaho Reports by reason of a challenge to such instructions is State v. Clokey, supra. The trial court instructed the jury that certain evidence had been admitted "not for the purpose of establishing or tending to establish the guilt or innocence of this defendant ... but is relevant and may be considered by you only as it may assist you in arriving at the punishment to be inflicted upon the defendant should you find him guilty of murder in the first degree." The Court used the opportunity of Clokey to remind the trial bench and bar that in such cases, where there is exercisable discretion in sentencing, evidence should be admitted in mitigation and aggravation—solely going to the determination of punishment:

> "The first paragraph of said instruction informs the jury that in the event they find the defendant guilty of murder of the first degree they may then determine whether the penalty to be imposed shall be death or confinement in the state penitentiary for life. Such instruction is in conformity with I.C. § 18–4004. Said instruction then calls attention to the evidence which was adduced during the trial regarding the *background and history* of the defendant *and his experiences and behavior in matters not related* to the alleged crime for which he was being tried.
>
> "In this connection evidence was introduced by and on behalf of appellant

showing appellant's place and date of birth; that his father died when he was between five and seven years old; that he was mistreated when a boy at home; that in 1929 he was found guilty of first degree robbery and as punishment therefor served three years and seven months in San Quentin prison; during the years that followed he worked at four or five different trades or occupations; that he suffered a serious accidental injury while working in the mines; that he had been convicted of reckless driving and drunken driving during the past two years and that he had a hit and run charge pending at the time of this trial; that his son became involved in trouble and was committed in the Industrial Training School at St. Anthony, Idaho; that after the son returned to the home appellant and his son got into a fight, shortly after which his wife, Betty Clokey, obtained a divorce.

"Such evidence is unrelated to the crime here charged and it is such evidence of biographical facts that the court refers to in said instruction No. 16. It is evidence regarding the *background* and *history,* the *experiences* and *behavior* of appellant which the jury may consider only as it may assist them in arriving at the punishment in the event the jury finds defendant guilty of murder of the first degree.

"One of the reasons for permitting the introduction of evidence of biographical facts where such facts are unrelated to the offense charged is that the law recognizes that previous good or bad conduct should be considered in fixing punishment for crime. Our statute provides the court with discretionary power to consider circumstances in aggravation or mitigation of punishment as follows:

" 'After a plea or verdict of guilty, where a discretion is conferred upon the court as to the extent of the punishment, the court, upon the oral suggestion of either party that there are circumstances which may be properly taken into view either in aggravation or mitigation of the punishment, may, in its discretion, hear the same summarily, at a specified time, and upon such notice to the adverse party as it may direct.' I.C. § 19–2515.

"I.C. § 19–2516 requires that the hearing be had in open court.

"This Court has considered the language used in I.C. § 19–2515 and has stated that:

" 'It may be open to debate as to whether the "circumstances" mentioned in § 19–2515, I.C., refer particularly to circumstances surrounding the commission of the crime and tending to aggravate or mitigate the character of the conduct involved, or whether such circumstances include also the convict, himself, as an individual, which would include his background, his age, upbringing and environment or any other matter appropriate to a determination of the degree of culpability. We think that the statute should be given the broader interpretation, particularly in a capital case. *James v. State,* 53 Ariz. 42, 84 P.2d 1081.' *State v. Owen,* 73 Idaho 394, 253 P.2d 203, 207.

"This Court has also determined that in cases where the jury may fix the punishment it should have opportunity, under proper instructions, to consider circumstances in aggravation or mitigation of the punishment.

In *State v. Owens,* supra, this Court said:

" 'It, therefore, appears that the law contemplates that in fixing the penalty, the court, when requested by either party, may and should hear and consider circumstances in aggravation or mitigation of the punishment. It logically follows that if it is proper for the court to hear and consider such evidence, the jury where it is called upon to fix the punishment, should have the opportunity to consider such proof, subject, of course, to a proper instruction limiting the jury's con-

sideration of such evidence to the determination of punishment, and cautioning that it is not to be considered in determining guilt or innocence, or be allowed to influence the determination of that question.' "

*State v. Clokey,* 83 Idaho at 327–28, 364 P.2d at 162–63.

In *State v. Owen, supra,* quoted in the above excerpt from *Clokey,* the trial court sustained the State's objection to the defendant's evidence offered "to show facts and circumstances of defendant's age, upbringing and environment for the purpose of mitigating punishment." 73 Idaho at 401, 253 P.2d at 207. The ruling of the trial court was held to be error, but on a four-one decision of this Court, a new trial was not ordered; instead, by a three-two split of the Court, which held that there had been a fair trial on the issue of guilt, the death penalty sentences of the jury were commuted to life imprisonment. 73 Idaho at 420–21, 253 P.2d at 219–20. The *Owen* court's opinion should have made it clear to the trial bench and bar that charges of first degree murder would encompass, at the same time, a trial of the guilt issue and a trial of the punishment issue:

"However, the law does recognize that previous good or bad conduct should be considered in fixing the punishment for crime. Such is the underlying principle of the persistent violator statute. § 19–2514, I.C. The courts have long recognized that the first offender should be accorded more lenient treatment than the habitual criminal. In addition to considerations of humanity, justice and mercy, the object is to encourage and foster the rehabilitation of one who has for the first time fallen into error, and whose character for crime has not become fixed. *State v. O'Dell,* 71 Idaho 64, 225 P.2d 1020.

"Our statute also provides the court with discretionary power to consider circumstances in aggravation or mitigation of punishment, as follows:

" 'After a plea or verdict of guilty, where a discretion is conferred upon the court as to the extent of the punishment, the court, upon the oral suggestion of either party that there are circumstances which may be properly taken into view either in aggravation or mitigation of the punishment, may, in its discretion, hear the same summarily, at a specified time, and upon such notice to the adverse party as it may direct.' § 19–2515, I.C.

"And § 19–2516, I.C., requires that the hearing be had in open court. It may be open to debate as to whether the 'circumstances' mentioned in § 19–2515, I.C., refer particularly to circumstances surrounding the commission of the crime and tending to aggravate or mitigate the character of the conduct involved, or whether such circumstances include also the convict, himself, as an individual, which would include his background, his age, upbringing and environment or any other matter appropriate to a determination of the degree of culpability. We think that the statute should be given the broader interpretation, particularly in a capital case. *James v. State,* 53 Ariz. 42, 84 P.2d 1081.

"It, therefore, appears that the law contemplates that in fixing the penalty, the court, when requested by either party, may and should hear and consider circumstances in aggravation or mitigation of the punishment. It logically follows that if it is proper for the court to hear and consider such evidence, the jury where it is called upon to fix the punishment, should have the opportunity to consider such proof, subject, of course, to a proper instruction limiting the jury's consideration of such evidence to the determination of punishment, and cautioning that it is not to be considered in determining guilt or innocence, or be allowed to influence the determination of that question. The offer of proof in behalf of the defendant Owen is as follows:

" 'Mr. Doane: Comes now the defendant William Lawrence Owen and

offers to prove by the present witness that the defendant William Lawrence Owen was born in Tannover, California, on October 2, 1911, in a family consisting of his mother and father, one, sister and one twin brother; that his father's occupation was that of a railroad foreman; that his nationality was Welsh and half-breed American Indian; that his mother was a full-blooded American Indian of the Wylacki tribe in northern California; that in the year 1917 when the defendant was of the age of six years his mother died; that the defendant had no real home life in the ordinary meaning of the term, and lived from time to time with his siter and other relatives; that he completed his formal schooling at the age of fourteen and thereupon proceeded to provide for himself, and his first major occupation was that of deck boy on a sailing vessel, upon which vessel he served for two and a half to three years; that since that experience at sea the defendant learned foundary moulding as his trade and has followed that trade ever since that time, and just prior to his coming to the State of Idaho, approximately two weeks before the date of September 7, 1951, was so engaged in his occupation.'

"The offer made by defendant Hastings consists of a lengthy recital of his military service in the United States Army commencing with his voluntary enlistment on July 9, 1940, and ending with his discharge in July, 1945. It contains a detailed statement of the different periods and places of service, engagements in which he or his unit participated, time, place and manner of wounds suffered and of decorations conferred, and also as to decorations and citations conferred upon the regiment, battalion and division in which he served. Except for his military record, he offered no evidence as to age, upbringing, and environment, which was not admitted. Such a detailed statement

of military exploits, engagements, wounds and medals, would have a natural tendency to prejudice the jury in the defendant's favor, and the nature of the offer here would suggest that that was perhaps its purpose. However, we think a briefer statement of military service would be a proper part of a background sketch.

"It is the general practice, at least in important criminal trials, to permit any witness to testify briefly and generally as to his background, giving such facts as date and place of birth, family relationship and occupation, to better enable the jury to appraise the general character of the witness. Each of the defendants was a witness in his own behalf and should have been permitted to testify to such general biographical facts in his capacity as a witness, if for no other purpose. Owen was permitted to testify only to the date and place of his birth. Hastings was permitted to testify to the date of his birth, that in 1932 when he was ten years of age his father died, and that his mother had remarried. The court should have admitted the evidence offered by Owen and anything of a like character which Hastings may have desired to introduce. 70 C.J., Witnesses, § 919.

"However, since the offers. were expressly limited to mitigation of punishment, and since the question of guilt is free from doubt, and since the error can be expunged by a commutation of the sentence, we hold that it does not require reversal of the judgment."

*State v. Owen*, 73 Idaho at 402–04, 253 P.2d at 207–09.

It is, then, abundantly clear that for at least thirty years, as documented by *State v. Owen, supra,* there was a sentencing scheme in Idaho that very nearly comported with the requirements the United States Supreme Court would in the 1970's require as mandated by the United States Constitution. The death penalty was not mandatory, but left with the jury, upon hearing evidence in mitigation or aggravation, the

discretionary choice between inflicting the death penalty or life imprisonment. An element probably lacking was the requirement of a specific instruction to the juries of Idaho defining aggravating circumstances, the existence of one or more of which would justify and dictate the imposition of the death penalty and the requirement that the jury set out in writing the requisite aggravating factor(s) proven beyond a reasonable doubt—in which respect, other than for a bifurcation of trials with the second stage to follow and hinge upon there being in the first stage a conviction of first degree murder, the Idaho procedure was much like that in Missouri, as outlined in *Bullington v. Missouri,* 451 U.S. 430 [101 S.Ct. 1852, 68 L.Ed.2d 270] (1981).

When, in 1973, the legislature (apparently acting at the behest of Idaho's attorney general, as was for certain the situation in 1977) returned to the mandatory death sentence, although the jury was indeed the sentencer even as it was prior to the 1911 amendment which allowed for the exercise of discretion, a step was taken in the wrong direction insofar as was concerned the mandate of the Supreme Court of the United States. Then, when the legislature passed the sweeping provisions of the 1977 Act, although it came close to meeting the requirements of *Woodson,* it misperceived *Woodson's* content to the extent that it believed itself behooved to abolish the jury function (as evidenced by the Statement of Purpose set out in the opinion of Justice Huntley) which is mandated by our Idaho Constitution, guaranteeing that the right to trial shall remain inviolate.

Had the majority of the Court engaged in any meaningful review of the history of death sentencing in Idaho, "at other times," while it would be hard pressed to affirmatively show that until *Furman* the jury in Idaho was not in fact the sentencer in nearly all capital cases, it could point to *State v. Arnold,* 39 Idaho 589, 229 P. 748 (1924), as authority for a judge to substitute himself as the court sentencer in place of the jury

when a defendant enters a plea of guilty to a charge of first degree murder. *Arnold* had the misfortune to be the first person in Idaho to ever enter a plea of guilty to first degree murder, and, although it doesn't appear in the Court's four-to-one opinion, *Arnold* also had the misfortune to be a black man charged with first degree murder. *Arnold's* case recently came under study by a class of approximately fifty law students, most of them in their third year, at the same time they were reviewing another more famous case of that era, namely *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Every person in that class was of the opinion that *Arnold* was not only wrongly decided, but a tragedy in the history of Idaho jurisprudence—not on any thought that Arnold wasn't guilty, but on the misfeasance of the criminal justice system. The main point of concern with *Arnold* is that, being an indigent for whom counsel was appointed, and fearing to place his life in the hands of a jury who would decide his fate if he went to trial on the issue of guilt or innocence, which was upon the advice of counsel that only a jury could sentence him to death under Idaho law, he pleaded guilty and was *by the judge* sentenced to death four days later. The facts and circumstances, succinctly laid out in the dissenting opinion of Justice William A. Lee, are:

> "The affidavit of appellant, which is not controverted as to the principal facts, states that following his arrest and prior to his arraignment and plea he was taken by the sheriff from the jail where he was being held awaiting trial, into the country and was seized by a mob, blindfolded and hanged, after which he was let down and required by the mob to give information about the commission of the alleged crime and the whereabouts of his alleged accomplice, in the nature of a confession of guilt; that when he was brought before the trial court and stated that he was without means with which to employ counsel to represent him the court appointed counsel to do so, and such counsel

advised him that public sentiment in the community was so high against him that if he entered a plea of not guilty and stood trial he would more than likely be given the death penalty, but that if he entered a plea of guilty the judge would not have authority to impose the death penalty upon him; and that when he entered a plea of guilty the judge did ask him if he realized that the death sentence might be pronounced against him on such plea and that he was so frightened he did not answer but relied upon the advice of counsel which the state had furnished him, and believed that the confession which the mob had extorted from him could be used if he stood trial, and so allowed the plea of guilty to stand, but that had he believed the judge had authority to sentence him to death upon his plea of guilty he would not have entered such plea.

"The plea of guilty was entered on the 11th of September, 1923, and the judgment of the court that appellant should suffer the death penalty was entered on the 15th of September thereafter. Upon securing additional counsel appellant, on October 8, 1923, moved that the judgment be vacated and that he be permitted to withdraw his plea of guilty and enter a plea of not guilty, which motion was denied." State v. Arnold, 39 Idaho [589] 604, 605 [229 P. 748] (1924), Lee, Justice, dissenting.

State v. Arnold, 39 Idaho at 604–05, 229 P. at 753.

The four member majority, not only upheld the trial judge's ruling that he could impose the sentence upon a plea of guilty to first degree murder, but also upheld the ruling below that Arnold, whose plight had attracted the attention of illustrious counsel of experience [6] (the appointed attorney who had pleaded Arnold guilty had been admit-

ted to the bar just a month or so before—another travesty) was not entitled to withdraw his guilty plea and enter a plea of not guilty. Regarding the latter use the Court was content to assume that the lower court "In denying the motion . . . evidently concluded that, upon the showing made, it did not appear that the appellant had entered a plea of guilty in ignorance of his rights, or because he had been misled by erroneous advice of counsel." 39 Idaho at 603, 229 P. at 752.

As to the authority of the judge to impose the death sentence, concerning which issue there was no precedent in Idaho, this appearing to be the first such case where an accused pleaded guilty to murder in the first degree, 39 Idaho at 594, 229 P. at 749, the Court relied upon two propositions which were said to uphold the validity of a judge-imposed death sentence:

(1) It being the duty *of the court* to pronounce judgment, where there is a guilty plea to first degree murder, "the court must do so." 39 Idaho at 597 [229 P. 748], citing State v. Ramirez, 34 Idaho [623, 203 P. 279], supra, and State v. Hoagland, [39] 34 Idaho [405, 228 P. 314], supra, mentioning also two cases from California.

(2) The requirement of § 9024, Compiled Statutes, which provided that "Upon a plea of guilty of a crime distinguished or divided into degrees, the court must before passing sentence, determine the degree." 39 Idaho at 595, 229 P. at 750.

The second ground was absolutely untenable. In two places the Arnold majority recognized that Arnold had pleaded guilty to murder in the first degree. So long as that plea was allowed to stand, the degree of the crime had already been determined.

The first ground is likewise on unsound footing. Following Arnold the Idaho cases

---

6. Two of the attorneys who volunteered their services on behalf of Noah Arnold would themselves later serve on the Supreme Court which turned awry their contentions, namely the Honorable E.B. Smith and the Honorable William M. Morgan.

are replete with expressions recognizing that the jury must on a first degree murder conviction impose one of two available sentences, imposition of a life term or imposition of death. The word "may" as used in Compiled Statutes 8212, which prior to 1973 continued to read the same, I.C. § 18–4004, other than for *Arnold's* case, has always been understood to mean that instead of an automatic death judgment on conviction of first degree murder, following the 1911 amendment, the jury while it may still give the death penalty, may also instead give a term of life imprisonment. Hence, entirely without legal foundation was the *Arnold* Court's statement that "The only effect of Compiled Statute § 8212, is that, where there is a jury trial on a plea of not guilty, the jury *may* decide which punishment shall be inflicted. Even in such case, if the jury does not decide the penalty, the court must do so." Such statements were clearly made in contravention of the Idaho Constitution which in murder cases, to the exclusion of all other crimes where the death penalty is not a possibility, leaves death sentencing for a jury determination. Reliance on *State v. Hoagland, supra,* and *State v. Ramirez, supra,* was wholly misplaced. Both were first degree murder informations which were tried to a jury, and in both instances, as was constitutionally required, the respective juries imposed the sentences of death. In *Hoagland,* which was decided just 28 days before *Arnold,* there were some issues of magnitude, but no discernible issue as to the right of a defendant to have a sentence of death imposed upon him by a jury, and only a jury. The *Hoagland* Court's total discussion of Compiled Statute § 8212 is this:

"Appellant suggests that the jury fixes the punishment. Under the provisions of C.S., sec. 8212, it might be observed that this section provides that the jury *may* decide the punishment to be inflicted, whether death or life imprisonment. If the jury fails to fix the punishment that duty then devolves upon the court. The fixing of the punishment by the jury at death was not shown to be the result of any bias or prejudice on the part of any juror and their *voir dire* examination fails to disclose any objection to their proper qualifications in this respect."

*State v. Hoagland,* 39 Idaho at 420, 228 P. at 319.

Exactly what this passage had to do with *Hoagland's* appeal is not at all understood. "Appellant suggests that the jury fixes the punishment." Such is not and does not purport to be an assignment of error. And, the jury did fix the punishment. Anything found in that entire paragraph is ostensibly pure dictum, and, one might surmise in view of the two cases being under consideration at the same time, with *Arnold's* opinion falling shortly upon the heels of the opinion in *Hoagland's* case, perhaps a gratuitous statement in *Hoagland* to be used as bootstrapping for an untenable position the Court was taking in *Arnold.* I see no other reason whatever for the paragraph in *Hoagland.* It never was the law, and it never became the law. But in *Arnold* it was claimed to be the law, to the great detriment of Noah Arnold. It is my understanding that in those days the Court prepared its own headnotes. Something is to be said for the fact that, in headnoting an opinion with fourteen headnotes, the above excerpted paragraph from page 420 [228 P. 314] was given no mention whatever. Nor does that curious statement ever appear to have been ever relied upon other than in *State v. Arnold.*

In *State v. Ramirez,* 33 Idaho 803 [199 P. 376], *supra,* the only issue involving Compiled Statute § 8212 revolved around an appeal contention that the death penalty judgment could not be carried out because the jury had returned a verdict fixing the punishment at execution, which the Court disposed of by saying that "The verdict of the jury, however, was not uncertain."

The Court in *Arnold, supra,* was guilty of improperly relying upon *Hoagland* and *Ramirez,* and rendered a decision contrary to

the mandate of Art. 1 § 7 of our Idaho Constitution. Better it should have heeded the words of Justice William A. Lee who wrote:

"The right of those accused of crime to a jury trial extends to the guilty as well as to the innocent, and in some jurisdictions human life cannot be taken by sanction of law without the verdict of a jury. In states not having such a provision I think the instances are comparatively rare where upon a plea of guilty the death penalty has been inflicted. It was recently stated upon credible authority that in one of the older jurisdictions, in more than 300 pleas of guilty of murder entered, only one person was executed upon such a plea, indicating the reluctance of courts to impose the death penalty except upon the verdict of guilty by a jury.

"An application to withdraw a plea of guilty in a capital case should be allowed where such application is made soon after the entry of the plea, and where it further appears that a confession of guilt was obtained by unlawful means and the plea of guilty has been made in the belief that such confession would be used against the accused if he stood trial, and all the other facts and circumstances were such as to induce a plea of guilty that might not otherwise have been made. This is more nearly in harmony with the humane policy of the law that human life will not be taken for the commission of crime unless all the usual and ordinary safeguards with which the law surrounds an accused person have been scrupulously complied with.

"The United States supreme court, speaking through Mr. Justice Harlan, in *Hopt v. Utah,* 110 U.S. 574, 4 Sup.Ct. 202, 28 L.Ed. 262, said: 'The natural life, says Blackstone, 'cannot legally be disposed of or destroyed by any individual neitherby the person himself nor by any other of his fellow creatures, merely upon their own authority.' 1 Bl. Com. 133. The public has an interest in his life and liberty.

Neither can be lawfully taken except in the mode prescribed by law. That which the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with or affected by the consent of the accused; much less by his mere failure, when on trial and in custody, to object to unauthorized methods. The great end of punishment is not the expiation of atonement of the offense committed, but the prevention of future offenses of the same kind. 4 Bl. Com. 11.'

"I am also of the opinion that the information in this case is fatally defective in that it does not comply with C.S., sec. 8827, and fails to be direct and certain as to the offense charged. Appellant's counsel say they are unable to find any authority or precedent that sustains the sufficiency of this information, and I think none can be found. It is beside the question to say that because appellant understands he is being charged with murder the information is therefore sufficient within the requirements of the law. He understood the nature of the charge when he was being hanged by the mob, but that did not obviate the necessity of filing a formal charge as required by law, in the trial court. The information itself is a sufficient and conclusive answer to the claim that this has been done.

"Entirely aside from any question as to the guilt of this appellant there should be no appearance of the courts approving or countenancing in any degree some of the proceedings resorted to by which this plea of guilty was probably obtained. I think a refusal to allow its withdrawal may be reasonably construed as a condonation of such unlawful acts. The language of the supreme court of Nebraska, in *Reynolds v. State,* 58 Neb. 49, 78 N.W. 483, seems to me peculiarly appropriate to the situation here, wherein it is said:

" 'It has been suggested, and is doubtless true, that in this case "outraged jus-

tice has laid her avenging lash on the back of one who honestly deserves the scourge," but we cannot for that reason alone affirm the judgment. The jurisdiction of the courts is not co-ordinate with that of the mob.'" (Emphasis added.)

State v. Arnold, 39 Idaho 605–607, 229 P. 753–54.

Thirty years later, and now thirty years ago, Justice Keeton wrote simply but with equal eloquence, and with a firmness of mind, that the accuseds in Idaho must have all of their rights if the criminal justice system as envisioned by the founders of the federal and state constitutions is to survive:

"The real question presented is whether or not the guilt of the appellants has been established in the manner and by the procedure provided by law, long recognized and established, and based on experience and sound reasoning.

"We should never lose sight of the fact that the guilt or innocence of appellants and the degree of crime are questions in the first instance to be determined by the jury. Our inquiry concerns the method, means and procedure by which the guilt was established and punishment imposed.

"If the appellants were convicted, or might have been convicted, and the death penalty imposed, because of errors in the proceedings taken against them, then it must be apparent to all that every other person similarly situated and placed on trial would be in exactly the same position; and the rules of law and procedure adhered to here must, of necessity, be applicable to all other persons.

"Under our rules of law and procedure, well recognized and established, before a person's liberty or life can be taken, it is necessary that he first be tried in a court of competent jurisdiction, before an impartial jury. When such a jury is impaneled, it is the exclusive judge of the facts—and in this particular proceeding, may, if it sees fit, determine the punishment to be imposed.

"Trial means a fair trial; that is, the accused's legal rights, during the proceedings had, must be safeguarded and respected, not alone in the observance of the naked forms of law, but in the recognition and just application of the principles applicable to the case. Until such time as an accused has been so tried and found guilty, he cannot be legally convicted.

. . . .

"It is far more important for society to accord a defendant in a criminal action a fair trial than he forfeit his life in expiation of the crime.

"The rules of law and procedure which apply to the appellants are, and should be, measured by the same yardstick and exactly the same standards as apply to all other persons; and in determining the appellants' rights, we necessarily measure and determine the rights of all others who might be similarly situated. A fair trial for those accused of crime protects the liberties of all.

. . . .

"If a person in a civil matter is wrongly deprived of his property, or a person in a criminal proceedings wrongly convicted of a less serious crime, it might be possible in some way to partially rectify the wrong done. Were the sentence imposed in this proceeding executed, regardless of how wrong it might be, no rectification could ever be made. It is impossible to call back the dead."

State v. Owen, 73 Idaho at 425–430, 253 P.2d at 223–26.

I have always been and remain impressed by the views of Justice Lee and Justice Keeton. There is far more at stake today than the life of Thomas Creech. Although the majority today can in apparent conscience restrict their review of the history of death penalty in Idaho by the casual observation that "At other places or at other times juries have been given an integral

role in imposing the death sentence," I submit that the views of Justice Huntley, meaning his own and those which he adopts as his own in the appendix to his opinion, make it abundantly clear that, historically since the time when the thirteen colonies broke free of English rule and English judges, and thereafter drafted the Constitution which has been the backbone of justice in these United States, the American people have by far and large for the most part restricted death sentencing to a jury of the accused's peers.

It is equally clear and beyond refute that Justice Huntley is entirely correct in his assertion that the Constitution of the State of Idaho now requires and forever has required that it be twelve jurors and not a single judge who will in Idaho impose the sentence of death.

## II.

## UNCONSTITUTIONALITY OF THE 1977 ACT AS BEING APPLIED

The Court's opinion delivered today, authored by Justice Shepard, and which commands a bare majority of the Court's membership is reminiscent of his views which were set forth in his dissenting opinion in *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979) wherein, in declaring his view to affirm a death sentence, he concluded:

"With all deference and respect to our brethren on the Bench of the United States Supreme Court, I regret that I can neither understand what they have said as a court, where they now stand as a court or where they may be going in this important area of the law involving capital cases and the death penalty. I may well be wrong in my interpretation of what they have said and what they will

do. I believe it is equally possible that today's majority may be in error in their understanding. I am sure the sentencing judge here suffered an agony of the spirit much greater than that of Mr. Justice Blackmun. This Judge had need to face the human rather than decide in the sanctity and solitude of his chambers while considering an abstract principle. The trial judge shouldered his heavy burden and I think this Court should affirm his decision, leaving to the United States Supreme Court, if they so desire, the option of deciding the fate of Phillip Lewis Lindquist." 99 Idaho at 775 [589 P.2d 101].

Although the *Lindquist* majority opinion authored by Justice Bakes readily recognized as a matter of law that Idaho's then existing death penalty statutes were invalid in light of "*Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) which held unconstitutional a North Carolina mandatory death penalty statute *virtually* identical to the Idaho statute..." 99 Idaho at 768, 589 P.2d at 110, the *Lindquist* dissent set forth in detail the facts of Lindquist's crime. Those facts were then, and remain, unpalatable, but cannot affect the obligation of an Idaho court to adhere to the Constitution of the United States and apply its precepts as the Supreme Court of the United States interprets and applies that Constitution. Admittedly, to have joined the Lindquist and Creech [7] execution bandwagons would have met with large spread public favor. Today, four years after *Creech* and *Lindquist,* that same Creech is again before the Court on review of the imposition of a death sentence. Once again a popular decision would be to affirm that death sentence. Of this there can be no doubt. Even before sentence was imposed upon Creech by the district court, the Boise Statesman, by far Idaho's newspaper of

---

**7.** A companion case decided at the same time as *Lindquist* and which simply followed its holding, *State v. Creech,* 99 Idaho 779, 589 P.2d 114 (1979). The defendant in *Creech* was shown to be an amoral multiple murderer, as equally an unpopular defendant as Lindquist.

largest circulation, in its Sunday edition of September 20, 1981, both editorialized on his fate and carried a lead article authored by its managing editor:

The Idaho **STATESMAN**

# Editorials

## Execution for Creech

A few people by their crimes leave society no choice but to kill them for its own protection. Thomas Eugene Creech who has been convicted of five murders, is one of those people. He should be sentenced to death for the most recent of his murders, the May 13 slaying of fellow Idaho Penitentiary inmate David Jensen.

Longtime readers of this editorial page will recognize that this stance is a turnaround for The Statesman. The change of position, taken with a good deal of soul-searching, reflects changes in membership on the editorial board and concurrent changes in the beliefs of some members. (For an explanation of why the position was changed, see the Dear Reader column on the opposite page.)

The general philosophical position in favor of the death penalty is based upon the belief that society must protect itself, and that in an imperfect world there is no way to protect against some people so dangerous and so irredeemable except to end their lives. Creech is the example that proves the point.

In 1976, Creech was sentenced to death for the 1974 murders of two men near Donnelly. That sentence was reduced to two terms of life imprisonment when the Idaho Supreme Court declared the state's 1973 mandatory death penalty law unconstitutional.

The court's decision was a good one. It followed a U.S. Supreme Court ruling that mandatory death penalties are arbitrary and capricious because they do not allow judges to consider mitigating factors in cases. The Idaho law was rewritten in 1977 to include a list of factors to guide sentencing and meet the constitutional requirements laid down in the U.S. Supreme Court decision.

In 1979, Creech pleaded guilty to another murder that took place in 1974, this one the shooting death of a Portland man. Creech again escaped the death penalty. Oregon's capital punishment law also had been declared unconstitutional.

On Friday, a California state appeals court upheld Creech's first-degree murder conviction in 1980 for the 1974 slaying of a Sacramento man. That crime, like the others, preceded a ruling that the state death-penalty law in effect at the time was unconstitutional.

Then, last May, Creech beat Jensen to death with a sock full of flashlight batteries while the two inmates were incarcerated together during an exercise period.

Jensen was no model citizen; at age 23 he had been in and out of jail on theft convictions. Still, he deserved protection. And if Oregon or Idaho had had viable death penalty laws in force at the time of Creech's earlier murders, Jensen might have been protected. He might be alive today.

By all accounts Jensen was a wayward but unviolent young man who never should have been locked up with someone like Creech, who had been implicated in three earlier attacks on jail inmates. For that mistake, prison authorities have to bear the blame. But to argue

that improving administration of our prisons and parole systems negates the need for the death penalty is to ignore reality. It is the nature of institutions that mistakes are made.

If steps can be taken to end the possibility that mistakes will result in harm to members of society, then those steps must be taken. Obviously, there is at least one such step—to put to death those who have proved beyond all reasonable doubt that they are a threat to the life of anyone with whom they come in contact.

To take the step involves a terrible responsibility. Capital punishment must be used sparingly and with every effort to be fair to the convicted murderer. Yet, if society is to protect itself absolutely against the likes of Thomas Creech, then such people must die.

# Why The Statesman now favors the death penalty

### By ROD SANDEEN
### Managing editor

To support or oppose capital punishment requires an examination of one's deepest convictions.

So it was with The Statesman editorial board last week. In a 5–4 vote, the board endorsed the death penalty, a reversal of a longstanding position.

The catalyst for the switch was Thomas E. Creech, who has been convicted of five murders, three of them in Idaho. His latest victim, a fellow inmate at the Idaho Penitentiary, was beaten to death with a sock filled with flashlight batteries.

Creech, 31, admitted killing the inmate, David Jensen, and pleaded guilty last month to first-degree murder. At that time, he told several persons he wanted to be executed.

In Idaho, that means death by lethal injection. The director of Corrections selects the deadly substance. It is administered by remote control while the condemned person lies strapped to a stretcher.

The Statesman opposed this form of punishment in 1978. "To paraphrase Gertrude Stein, murder is murder is murder," the editorial said. "Execution is just a pretty name for it."

But three years later, as an editorial in today's paper says, The Statesman is endorsing the death penalty.

The decision was made after the issue was debated at a board meeting. Proponents said the death penalty is needed to protect society. Some people, the majority argued, have no redeeming qualities. They remain a threat to society as long as they are alive.

Frustration was expressed at our permissive legal system, which seems to turn criminals loose while they remain a threat to others. The argument was made that if Creech's original death sentence had been carried out, he would not have killed Jensen, the 23-year-old inmate from Pocatello who had the misfortune to be alone with Creech during an exercise period.

No members of the board thought the death penalty served as a deterrent. The belief was that people who plot and carry out a murder — the type of killing for which the death penalty is applied — don't plan to get caught. The board also reasoned that because most murders are crimes of passion, capital punishment doesn't serve as a deterrent. Those killings are committed in a fit of anger. Their victims usually are acquaintances or relatives.

Those who opposed the editorial position made strong arguments, too.

One distinctive quality that puts America above many other nations is the value it puts on human life, they said. In El Salvador, Iran and many other countries, the disregard for human life is appalling. For Americans purposefully to kill a human being, no matter what the circumstances, erodes the value of all human life, opponents argued.

The minority also asserted that the real motive for the death penalty is revenge. As many supporters of the death penalty will admit, capital punishment is an expression of society's wrath at murder by killing its murderers.

The subject of the death penalty came before the board after Creech killed Jensen. Sensing controversy and divided opinion, board members agreed to come to grips individually with the issue and debate it openly two weeks later, near the time Creech is due back in court. His presentence investigation is due Friday.

With that preparation, the debate was quick. Everyone gave his opinion.

Members agreed readers deserved an explanation because of the gravity of the subject. Readers have a right to expect consistency in the editorial positions of the newspaper. If positions on significant issues change, readers should be told why.

The change in the makeup of the board in the last three years accounts for a significant reason why the position was reversed. But more telling is the role of Creech himself. He seems without conscience, without chance of rehabilitation. He, in fact, wants to be sentenced to death.

With Creech as the focal point of a death penalty debate, the change in position seemed inevitable.

Ordinarily such articles would not find their way into an appellate opinion. But, ordinarily such articles are not part of an appellate record. Here, sad to say, they are part of the appellate record which we review. Ordinarily, if in an appellate court record, they are found as exhibits to motions for change of venue prior to a trial or motions directed at excessive publicity which allegedly deprived an accused of a fair trial. Such is not so here.

The articles are part of the appellate record because they were in the presentence report submitted to and considered by the trial court in reaching its sentencing decision, concerning which Justice Huntley has written separately, and to which I will hereinafter turn, *infra,* time permitting.

In addition to the public favor which might reasonably be expected by yielding to the views of the local newspaper, just three weeks prior to that publication, a most highly respected district judge at a resentencing hearing in a capital case stated on the record at that hearing his firm conviction "That the present makeup of the members of the Supreme Court of the State of Idaho would not affirm a death sentence, I'm satisfied of that, under any circumstances, factual circumstances, that were presented to them." Upon that basis, but also noting the Court's agonizing on having previously imposed a death sentence on that defendant, noting also the defendant's agony in two or three years incommunicado on death row while the Idaho Supreme Court reviewed his findings of fact and conclusions, the court said: "And for this reason, *I refuse to follow the mandate of the Supreme Court* and make findings in mitigation." *State of Idaho v. Osborn,* 102 Idaho 405 [631 P.2d 187] (1983).

The trial court's remarks, being newsworthy, were given prominent statewide dissemination. So thusly it has been made evident that a decision from this Court upholding any death sentence, and especially one for Mr. Creech, was hailed as popular even before Mr. Creech came before the district court for sentencing.

Shunning such influences, and agreeing with Justice Huntley that no person shall be put to death without due process of law, no matter how deserving of that penalty, and regardless of his own desire for such an execution, for reasons expressed by Justice Huntley, I must also conclude that in this case the sentencing procedure was a total failure of due process·under both the Constitutions of the United States and of the State of Idaho, specifically alluding to the remarkable use of a presentence report comprised almost exclusively of hearsay, without any right of any cross-examination. Obvious in the extreme, and with constitutional due process concerns put aside, the statutory procedure selected by the legislature for reaching the decision between a sentence of life and death was not followed.

The legislature specifically has required that where imposition of death is a sentence which may be imposed, the only alternative being a life sentence, there will be a sentencing hearing, the purpose of which is for HEARING relevant evidence and argument of counsel. I.C. § 19–2515(c). While "relevant evidence" is a term which may, perhaps, be open for discussion, the word "hearing" is not. Since statehood, and before, this Court has steadfastly distinguished between evidence which a trier of an issue *hears* live from the witnesses, and evidence which, like on appellate review, is by affidavits, documents; or, otherwise put, a "cold record."

That the trial judge made use of the presentence report, perhaps almost exclusively, is not to his discredit—not according to a three member majority who experience no trouble in seeing that resolution of a life or death issue may be determined "from the voluminous information available in the presentence report."

Defense counsel's request for a hearing (by a jury) where the aggravating and mitigating factors would be decided on the basis of live testimony of witnesses should have been honored. Whatever may be the law under the Federal Rules of Civil Procedure, relied upon by the majority, although I.C. § 19–2515(c) directs the trial judge to "or-

der a presentence investigation to be conducted," the statute does not, nor does it purport to, nor could it when viewed under a due process challenge, declare that the report of that investigation, or any part of it, may become the evidence upon which a judge (properly a jury) may render a death sentence. It will serve as a source of information to prosecutors and defense counsel, but that is and should be the extent of its permissible use. Where a defendant has been tried by a jury and by it convicted of first degree murder, evidence of the crime is already before the sentencer, be it judge or the same jury who rendered the verdict. The statute recognizes this, and provides that "Evidence admitted at the trial shall not be considered and need not be repeated at the sentencing hearing." Clearly, then, the statute contemplates that where there has not been a trial, that evidence will necessarily have to be presented to the sentencing authority—be it judge or jury. The majority in this case are of a different view, obviously. Hence it bothers them not that the facts of the homicide were laid before the trial judge in the form of newspaper articles and editorials, and in garbled reports of a number of taped interviews with the sheriff's department conducted with Creech—the first of which in my reading of the presentence report discloses to have taken place with a complete absence of any *Miranda* warnings.

The majority's reliance on some recent Idaho cases for the wholesale admission of such hearsay (The presentence report consists of 13 pages. To it are attached various documents which go to a depth of 2⅝ inches.) is misplaced. Those cases, *State v. Johnson,* 101 Idaho 581, 618 P.2d 759 (1980), *State v. Tucker,* 97 Idaho 4, 539 P.2d 556 (1975), to which might have been added *State v. Coutts,* 101 Idaho 110, 609 P.2d 642 (1980), and *Ybarra v. Dermitt,* 104 Idaho 150, 657 P.2d 14 (1983), did not involve sentencing for first degree murder. Nor does *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981) sustain the *Osborn* majority opinion in its condoning of the use of wholesale, random, hearsay. In *Osborn* that defendant, too, pleaded guilty to first degree murder. The *Osborn* Court did say, with which I did not agree, that it was there permissible to use the cold record of a preliminary hearing transcript in lieu of live testimony presenting evidence of the crime, notwithstanding the mandatory language of I.C. § 19–2515(c); and it was to that issue, and that issue alone, that the majority said, responsive to my own contrary view, that there had been no error on the part of the trial judge at the sentencing hearing. The Court did not there say or intimate that the hearsay running rampant in a presentence report could be the evidence upon which a judge could hinge his decision in a post-conviction trial of the nature of the defendant's crime and the nature of his past and of his character. The majority simply choose to ignore that in *Osborn* counsel for the defendant not only pleaded his client guilty, did not, in the face of the 1977 Act, claim a right to jury trial at sentencing, and did himself rely upon the preliminary testimony and material in the presentence report in presenting matters in mitigation. I can understand a majority opinion which in *Osborn* thus theorized that the error in not following the statute was waived, even though it is generally believed that a valid death sentence can be imposed only when the statutory procedure is closely adhered to, but I cannot comprehend a majority opinion which allows rampant hearsay at the sentencing trial, but not at guilt trials. It would seem that the second trial is considerably more important than is the first.

The majority ignore the highly singular fact that today's presentence investigation and report are of rather recent origin, and, from my own study, came into existence where a defendant notified the trial judge of his intent to ask for leniency, usually some form of withheld judgment or suspended sentence, coupled with a term of probation. This Court, however, has misused the procedure to the detriment of those who were supposed to benefit therefrom. As suggested reading I submit my dissents in *Coutts, Johnson,* and *Ybarra.*

For my part, with what I consider proper and due deference to the holdings of the Supreme Court of the United States, in matters of death sentencing, I cannot in good conscience look away when the statutory procedures are not followed. Nor will I fail to require the same due process at a capital sentencing trial which has always been required at the guilt-innocence trial. At the same time, where the statute flatly requires the imposition of death whenever one or more aggravating factors are found to exist, and they are not outweighed by mitigating factors found to exist, I am much troubled by the knowledge that prosecuting attorneys apparently are thought to have unlimited discretion in bargaining away first degree informations which they have themselves signed, and that they apparently are thought to have the discretion to determine both before and after conviction whether the death penalty will be sought—in which respect district judges are apparently of the view that a prosecutor's election to not seek the death penalty is the end of the inquiry, or at the least a mitigating factor. Back of it all prosecutors initially assume the right to decide what homicides will be charged as first degree murder, and which will not. This latter may be an unavoidable circumstance, but it would seem that if justice, including the death penalty, is to be dealt evenhandedly, once a prosecutor charges first degree murder, from that time on he is committed to laying his first degree murder charge before a jury. After that, if the jury convicts, it should not be the prosecutor, but a jury who determines a just and mete sentence.

## III.

### DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL

Time constraints permitting, there is in my view more which can be said concerning the issues discussed by Justice Huntley. There is also the need to discuss and question the due process issues which arise if the Court determines to issue its opinion without allowing briefs or argument of counsel attendant to the resentencing of Mr. Creech

which just took place in district court on the 17th day of February of this year, a transcript of which hearing was furnished to the Clerk of this Court on April 6, 1983, a scant two weeks ago as I write this far along into my own opinion, which is done without the benefit of briefs of the parties. A more pressing need, however, is to express considerable doubt upon the constitutionality of the process by which Creech was brought into court on the court's own motion to go through the formality of entering a guilty plea. The circumstances of this affair put me much in mind of *Boykin v. Alabama,* 395 U.S. 238 [89 S.Ct. 1709, 23 L.Ed.2d 274] (1969). Other than for lack of jury involvement under the Idaho legislature's capital sentencing procedures, there is little difference and, as I will point out, both jurisdictions provide for an automatic appeal from a death sentence. Where in Alabama an "automatic appeal in capital cases also requires the reviewing court to comb the record for 'any error prejudicial to the appellant, even though not called to our attention in brief of counsel' *Lee v. State,* 265 Ala. 623, 630, 93 So.2d 757, 763," *Boykin,* 395 U.S. at 241 [89 S.Ct. at 1711], in Idaho on automatic appeal from a death sentence, it was recently held that under I.C. § 19–2827 "we may not ignore unchallenged errors .... We have previously recognized as much in this state by holding that fundamental error, even absent objection at trial will be reviewed on appeal." *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981). Obviously under this rule we are also obliged to make that same review on automatic appeal even though plain or fundamental error as was involved in *Boykin* is not assigned by appellate counsel.

The High Court in *Boykin* held that "It was error, plain on the face of the record, for the trial judge to accept petitioner's guilty plea without an affirmative showing that it was intelligent and voluntary." 395 U.S. at 242 [89 S.Ct. at 1711]. The *Boykin* defendant pleaded guilty on his first arraignment; Mr. Creech pleaded not guilty initially. At a subsequent hearing when a guilty plea was entered for him, the *trial*

*court* conducted the hearing, allowed cross-examination by the prosecutor, admitted the prosecutor's offered exhibits, and made oral findings:

"THE COURT: Very well. Thank you very much, Mr. Creech. You may step down. I believe you have been very candid with the Court.

"For the record, the Court will find that the defendant understands the nature of the offense to which he has just plead guilty and he understands the consequences of his plea of guilty, and that there is a factual basis for the guilty plea, and that the guilty plea was freely and voluntarily made.

"I will accept the guilty plea and I will direct my Clerk to enter the same."

This does not satisfy my notions of due process. Time having run out on me, I must necessarily save for another time or some other place an in-depth review of this strange affair. Creech had pleaded not guilty, and in due time a jury would pass upon his guilt or innocence. His court-appointed attorney adamantly opposed the procedure—which was against his advice—and insisted on being allowed to withdraw from further representation of Creech. The motion was denied, although from that time on Mr. Creech really had no further need for the attorney whose advice he disregarded. Time permitting, Mr. Creech might have followed that advice, but the trial judge moved too precipitately for any meaningful reflection; at the time the trial judge assumed the responsibility for helping Mr. Creech along in his bent for self-destruction, for which Mr. Creech had a Gilmore-like penchant as the members of this Court personally observed in connection with the first *Creech* case, and as is more than amply demonstrated in various sections of the presentence report attachments, Mr. Creech was then and there divested of effective assistance of counsel—which was his guarantee under both the United States and Idaho Constitutions. The precipitate manner in which it all came about is not an acceptable procedure.

Creech, following the homicide at the penitentiary, was turned over to county authorities and incarcerated at the county jail. I have already mentioned the impermissible tape questioning transcripts of which one is in the presentence report along with other question and answer transcripts where he was given *Miranda* warnings prior to being taken through the same routine without the warnings.

From the jail Creech, the defendant, Creech the counseled defendant, wrote his own letter to the district judge declaring that he wanted to enter a plea of guilty. Assuming the letter was received by the judge on the next day, as was probably so, the very next day after receipt, or at least no later than two days after the letter was sent, the judge apparently had Creech delivered to his courtroom, and apparently summonsed Creech's counsel as well. And then the hearing took place as aforesaid—of which the record contains a transcript.

In the first place I think that there is something lacking in our criminal justice system where criminal defendants are allowed to bypass their counsel and engage in direct dealings with the court. Such conduct in my view is improper, disruptive, productive of error and possible injustice, and cannot be tolerated. In so saying I level my criticism not at the particular judge, but at the practice. As alluded to above, in Mr. Creech's first case before this Court he took it upon himself to bypass counsel and write directly to the Court. And, he was not the first; nor was he the last. As often as such communications have been received and circulated to the Court membership, I have denounced and remonstrated against the practice continuing. It is an evil, and it will produce evil rewards.

Here, to me it seems inescapable that Mr. Creech, unless he omnisciently knew that the statutory scheme for death sentencing was unconstitutional, cannot realistically be said to have knowingly and intelligently waived his right to a jury trial of the degree of his guilt, and if found guilty of first degree murder, then, in turn, to have at the

same time waived his right to have that same jury, from the evidence which they heard from live witnesses as to his crime, as to his past, to his mental condition, and to his prognosis, decide whether he should die or live.

## OPINION ON DENIAL OF PETITION FOR REHEARING

BISTLINE, Justice.

### I.

My vote was to grant the rehearing, although I concede that there is not a strong likelihood that there would be any change in the votes to affirm and the votes to reverse, notwithstanding that the majority has not as yet addressed in this case the well-documented dissenting views that the Idaho Constitution guarantees that persons convicted of first degree murder in Idaho shall have their life-or-death fate decreed by jurors of their peers. In another death penalty case, *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983) the author of that 3–2 majority opinion, who is part of the 3–2 majority in Creech's case, has attempted to explain away the right of the Idaho Constitution, but the attempt is feeble and unconvincing. Notwithstanding that any Idaho court which has ever addressed the proposition has always held that the guarantee of Art. 1, § 7 is to be construed to apply as it existed at the date of the adoption of our Constitution, the majority opinion in the *Sivak* case points to convictions of second degree murder, of which it says the "sentencer was the judge, and not the jury." A comparison is made to first degree burglary and second degree burglary. This is sophistry at its best. No one has ever contended that jury sentencing at the time of the adoption of our Idaho Constitution was ever applicable other than in criminal cases charging first degree murder. The *Sivak* majority declines to enter upon a discussion of *People v. Walters,* 1 Idaho 271, (1869), where the jury, full well knowing that their verdict of first degree murder would send the defendant to the gallows, nevertheless

so convicted him, but recommended the mercy of the Court—a futile recommendation to a judge who was without any authority to dispense mercy in going through the formality of imposing the written judgment of execution by hanging which the law required. Was the judge in *People v. Walters* the determiner of the sentence? Or was it the jury?

Who was the sentencer in the first degree murder following admission to statehood? Again it was the jury. Exactly as had been so in territorial days, all the part a judge played was to affix his official signature to the judgment and death warrant. *State v. Perry,* 4 Idaho 224, 38 P. 655 (1894).

The *Sivak* majority provides no discussion of the enlightening 1911 amendment to the statutory provisions. Obviously of the belief that the responsibility for sentencing in first degree murder cases belonged to the jury, and with it the correlative right in the defendant to have his sentence so fixed, the 1911 legislature placed some discretion in the hands of the jury—with no discretion whatever entrusted to judges—who as before would simply sign the written judgments, which were the formal documentation of the decision rendered by the jury. Alive and interested in the outcome of the 1936 VanVlack trial, *State v. VanVlack,* 57 Idaho 316, 65 P.2d 736 (1936), I well remember that his jury found him guilty of murder in the first degree and imposed his punishment at death, whereas in my first year of law school another jury set the defendant's penalty for first degree murder at life imprisonment. *State v. Golden,* 67 Idaho 497, 186 P.2d 485 (1947). The *Sivak* majority has not in *Sivak,* nor in this case, demonstrated how Idaho district judges, both in territorial days, and then in statehood until *Furman,* were invested with any discretionary authority in sentencing for first degree murder convictions. The reason is simply that the matter of determining between life and death was entirely in the hands of the jury. It was thusly so at the time our Idaho Constitution, including its Art. 1, § 7, was adopted. The author of *Sivak* concedes that Art. 1, § 7 "has been

interpreted in several of the cases as guaranteeing the right of trial by jury as it existed at the time of the adoption of the Constitution." In what some trial attorneys may see as a deft display of judicial sleight-of-hand, the *Sivak* author cites for the proposition so stated by him the case of *People v. Burnham,* 35 Idaho 522, 207 P. 589 (1922).[1] Contrary to indications, this was not a criminal case, but a statutory action to remove a civil officer—which the court noted as being in the nature of quo warranto, a civil and not a criminal action. The *Sivak* author, and those who joined that majority opinion, might have better commented on this Court's holdings in the criminal cases of *In re Dawson,* 20 Idaho 178, 180, 117 P. 696 (1911), and the earlier case of *In re Prout,* 12 Idaho 494, 86 P. 275 (1906)—excerpts of both cases being prominently set forth in my *Creech* dissent, Part I. As matters now stand the only response by the *Creech* majority to the proposition that jury sentencing is constitutionally mandated must be found by resorting to *Sivak,* which response is neither responsive nor convincing. If it be that the majority has simply determined to overrule *In re Dawson,* as indicated by the judicial sleight-of-hand of citing the non-criminal cases, in preference to *In re Dawson,* a criminal case, it seems that a more outward stance would be more befitting a case so grave as this.

## II.

When the Court heard oral argument at Twin Falls last fall the Solicitor General was adamant in his belief that the presence of the defendant at the pronouncement of sentence was a formality that could be dispensed with, notwithstanding the clear language of a statute requiring his presence. Oral argument in that vein paralleled the State's brief:

> "No proceeding was conducted for the purpose of orally announcing the sentence imposed upon the appellant, and that circumstance is the basis of appellant's claim of error.

"The complaint made here by appellant relates to a highly formalistic defect (if it is a defect at all) of the kind which the court is enjoined to ignore. Rule 52, I.C.R. Appellant was given every conceivable opportunity to present evidence, to argue, and to speak personally at the sentencing stage of the action against him. The long-standing test for determining whether the defendant's absence at a particular point in the proceedings amounted to constitutional error was set forth in *Snyder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. [330] 3340, 78 L.Ed. 674 (1934), and was reaffirmed in *Faretta v. California,* 422 U.S. 806 [95 S.Ct. 2525], 45 L.Ed.2d 562 (1975), and *State v. [Carver] Carter,* 94 Idaho 677, 496 P.2d 676 (1972).

. . . .

"The central purpose of the due process clause, as it applies to criminal cases, is to secure to the defendant the right to be fairly treated in the proceedings taken against him. *Faretta v. California, supra; Snyder v. Massachusetts, supra; State v. Carver, supra.* 'Fundamental fairness,' as far as the concept is relevant to the appellant's argument, required only that the appellant be afforded every reasonable opportunity to present evidence and argument in mitigation, to make a personal statement, and to make appropriate legal objections. *Faretta v. California, supra; Snyder v. Massachusetts, supra; State v. Carver, supra; State v. Higley,* 621 P.2d 1043 (Mont. 1980); *State v. Walker,* 536 P.2d 657 (1975); *People v. Coyle* [88 Cal.App.2d 967], 200 P.2d 546 (Cal.1948), *cert. denied,* 337 U.S. 909 [69 S.Ct. 1042, 93 L.Ed. 1721], *reh. denied* 337 U.S. 934 [69 S.Ct. 1485, 93 L.Ed. 1740].

"Clearly, these considerations do not bear materially on the facts of appellant's case. Appellant was not denied any opportunity to be heard on any matter of mitigation or defense. The only 'proceeding' he missed was the judge's personal

---

1. An additional case cite is *Christensen v. Hollingsworth,* 6 Idaho 87, 53 P. 211 (1898). The trial bench and bar may well be surprised to see a citation to a civil case which was brought to reform a mortgage—purely an equitable non-jury type of action.

deliberations about the sentence. Appellant could not have participated further than he did, even if the court had brought the appellant into the courtroom and read the opinion in open court. Thus, the privilege of presence sought by appellant 'would be useless, or the benefit but a shadow,' *Snyder v. Massachusetts, supra,* and the defendant's absence in such circumstances had no constitutional significance. Nor, for the same reason, could a rule or statutory violation of no consequence be the basis for setting aside the appellant's sentence on the theory that it was a violation of state statute and rule. Rule 52, I.C.R.

"Appellant, without the support of any authority whatever, argues that due process of law is tested by the application of factors other than the potential of absence to frustrate the fairness of the proceedings.

"He argues that fundamental fairness requires that the prisoner be 'looked in the eye' at the time of sentencing, that person to person confrontation at the time sentence is announced is necessary because it may induce the judge to be more 'humane' in passing sentence, and that fundamental fairness as an element of the due process clause requires that closed, secret proceedings at sentencing be prevented.

"The suggestion that the due process clause requires the judge to look the defendant in the eye at the time sentence is pronounced in order to influence the judge to be more 'humane,' smacks of an argument that somehow the due process clause requires that the sentencing judge be intimidated by the magnitude of the task before him and thereby frightened away from a death sentence. Respondent has found no case supporting this theory, and the appellant cites none. In fact, guided discretion at sentencing requires that the judge be *influenced* only by objective factors related to the offender and his crime. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

. . . .

"Appellant also argues that because the sentence was not orally announced he was not given the opportunity to state whether there was any 'legal cause' why sentence should not be pronounced.

"The defendant's right to be heard before sentence is pronounced is undisputed. Rule 33(1), I.C.R.; *State v. Goodrich,* 97 Idaho 472, 546 P.2d 1180 (1976). However, the right of allocution requires only that 'a trial judge before sentencing must directly address the defendant, and offer him personally a clear opportunity to make a statement in his own behalf, and to present any information in mitigation of punishment...' *State v. Goodrich,* 97 Idaho at 480 [546 P.2d 1180]. Appellant was not only offered the right to speak several times, but he took advantage of the right of allocution and made a lengthy statement to the court before sentencing. The right of allocution does not contemplate that the defendant may continue to speak forever, or that his counsel may do so. Orderly process requires that at some time the proceeding come to an end and the judge announce the sentence."

Respondent's Brief, pp. 13–18.

Notwithstanding this strong contention from the State, the Court, some three and one-half months after hearing argument, entered its order vacating the death sentence which the district judge had imposed on Creech:

"In the above-entitled cause, defendant Creech entered a plea of guilty to a charge of first degree murder and in accordance with I.C. § 19–2515, the district court conducted a hearing into mitigating or aggravating circumstances and thereafter on the 25th day of January, 1982, the district court purported to impose the death sentence upon the defendant; and

"The cause being before this Court both on appeal by the defendant and also pursuant to the automatic review of death sentences mandated by I.C. § 9–2827; and

"It appearing from the record, without any contention otherwise by the respon-

dent State of Idaho, that contrary to the requirements of I.C. § 19–2503 and I.C.R. 43(a), the trial judge purported to impose sentence in the absence of defendant and his counsel and without the presence of defendant and his counsel in open court, but rather by means of a written imposition of a sentence of death;

"NOW, THEREFORE, IT IS HEREBY ORDERED that the sentence of death imposed upon the defendant in the absence of the defendant and his counsel be and the same hereby is vacated and the cause is remanded to the Honorable Robert Newhouse, District Judge of the Fourth Judicial District of the State of Idaho, Ada County, who shall within fourteen (14) days from the date of this Order, in open court and in the presence of defendant and his counsel, enter a judgment of conviction and impose such sentence upon the defendant Thomas Eugene Creech as to the said District Judge may appear to be just and appropriate. In the event that said shall impose a sentence of death, a warrant therefor shall issue in accordance with I.C. § 19–2705; and

"IT IS FURTHER ORDERED that on the completion of said proceedings a transcript thereof shall be immediately prepared, delivered and lodged with this Court not later than five (5) days from the completion of said proceedings; and

"IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this cause pending compliance with this Order and thereafter will determine the issues on appeal; and

"IT IS FURTHER ORDERED that this Order be served upon the Honorable Robert G. Newhouse, District Judge of the Fourth Judicial District, the Office of the Attorney General, and counsel for the defendant."

My vote was against this piecemeal procedure; my reasons are readily stated. First of all, there was no precedent for vacating (in essence reversing) the district court judgment without this Court issuing the supporting opinion which has forever been the procedure and has basis in statutory law. There was also no precedent for this Court's order commanding the district judge to enter judgment of conviction and impose sentence within fourteen days. There was likewise no precedent for this Court in reversing the judgment to retain jurisdiction. This part of the order was tantamount to an instruction to the district judge to again impose a sentence of death. It readily follows, as night follows day, that if the district judge held a sentencing hearing and imposed a life sentence, there would be no automatic review as is provided where the sentence is death. It is of little wonder that the district judge on reading the order of this Court declared to the press that it was so much nit-picking, and that he would bring Creech into his court and read him the judgment imposing the death sentence which had not theretofore been read to Creech in open court.

Secondly, the action taken by the Court certainly bore out the contentions of the Solicitor General as above set forth. If the attorney general was correct, then the Court erred in vacating the death sentence which was first imposed. If the solicitor general was incorrect, the office was entitled to a written opinion passing upon the contention. Such was not forthcoming. Instead, the rather serious break in precedent was handled by a footnote:

"The district judge executed a written document which imposed the death sentence upon Creech. That document was served upon Creech and his counsel. I.C. § 19–2503 and I.C.R. 43(a) require sentence to be pronounced in open court with a defendant and his counsel being present. The district judge did not conform with those requirements. This Court, therefore, by order of the 24th day of February, 1983, vacated said sentence of death and remanded the cause to the district court for imposition of such sentence as the district judge might find just and appropriate to be imposed upon Creech in open court with Creech and his counsel present. Consistent with that order of remand, the district judge convened the court on the 17th day of March,

1983 and in the presence of Creech and his counsel, imposed the death penalty upon Creech. The execution of that death penalty was stayed pending these proceedings before this Court."

[See maj. opin., at p. 365 n. 1.]

The footnote is accurate, other than that it implies that the district judge conducted a sentencing hearing to determine a "just and appropriate" sentence. There was no hearing. The district judge merely brought the defendant into his courtroom and read to him his former judgment imposing the death sentence. From this judgment Creech again appealed to this Court, where it was assigned Supreme Court No. 15000. The first appeal resulting in the order above set forth was No. 14480. After that order was entered, Creech was no longer under any sentence of death, and so remained until March 17, 1983, at which time the district judge carried out the mandate of this Court's order as the district judge read that order. The district judge read it as simply requiring the formality of having Creech present in court for imposition of the same death penalty previously imposed. In that regard the view of the district judge was amply sustained by a "press release" which the Court prepared and issued along with its order, which was as follows:

"The Idaho Supreme Court issued an Order today remanding the death sentence of Thomas Eugene Creech to the district court.

"The Court pointed out in its Order that the trial judge had imposed the death sentence by a written document rather than imposing the sentence in open court in the presence of Creech and his attorney as required by statute and court rule. Therefore, the Court vacated the death sentence and remanded the case to the district court with instructions that it again impose a sentence upon Creech in open court in the presence of Creech and his attorney.

"The Order indicated that the Supreme Court would retain jurisdiction of the case and that the district court, after resentencing, should immediately furnish the Supreme Court with a transcript of the proceedings."

If there was any uncertainty in the order itself, the press release clearly told the district judge that the Supreme Court was, notwithstanding the vacating of the death sentence, continuing to lay hold of the case. In other words, the district judge was all at one time being told to conduct a sentencing hearing and arrive at a "just and appropriate" sentence and also to reimpose the death sentence. This is exactly what the judge did, and as I have said there was no hearing. Although the district court cannot be faulted for obeying a clear mandate from this Court, there simply was no authority or precedent whereby and whereunder this Court could reverse and remand for resentencing and yet retain jurisdiction of the case. Better that this Court would have agreed with the solicitor general than to have created such a convoluted situation as the one remanded to the district court. Other than for the language of the order and the press release it is hardly to be doubted that a district judge on reversal or vacation of a judgment imposing sentence should not in a capital case conduct the type of a hearing which is statutorily mandated, or as was so in another recent case, flatly defy the mandate of this Court. *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), and *State v. Osborn,* 104 Idaho 809, 663 P.2d 1111 (1983).

Thirdly, there could not be, and was not, an orderly administration of justice—important in all cases, but especially critical in capital sentencing cases—with this court vacating the judgment and its imposed death sentence, and at the same time declaring that it somehow retained the jurisdiction acquired when the first appeal was taken on the initial sentencing. Defense counsel was aware that Creech, who had been first sentenced to death on the 25th day of January, 1982, was entitled to the same statutory hearing which this Court directed in *Osborn I,* but, also saw that this Court was strangely insisting that it had continuing jurisdiction after vacating the

judgment the appeal from which gave this Court jurisdiction—along with the statutory provisions for automatic review. Accordingly, made aware that the district judge read this Court's order and press release as merely requiring the formality of Creech's presence, defense counsel—faced with a duality of jurisdiction, and aware of the deadline that this Court's order imposed upon the district court, and with Creech's main counsel not available, moved this Court for a stay of the order insofar as it directed the district court to act within fourteen days. Responsive thereto this Court ordered that the time for the hearing on remand was extended—"shall be conducted on or after March 14, 1983," and on or before April 4, 1983. This order was entered on the 3rd day of March, 1983. The opening paragraph of the order contained a recitation the language of which could not but have fortified the district judge's view that he was not to actually accord Creech a second sentencing hearing:

"The Court having entered an ORDER herein on February 24, 1983, temporarily remanding this case to the District Court for the purpose of requiring District Judge Robert G. Newhouse to announce and impose sentence upon the defendant Thomas Eugene Creech in open court and in the present of said defendant and his counsel; . . . ."

The district court, thus having been granted on the 3rd day of March, 1983, a span of time from the 14th day of March, 1983, until the 4th day of April, 1983, ordered, on the 15th day of March, 1983, that Creech and his counsel appear before the court two days later on the 17th day of March at 9:00 a.m. "so that this court may conduct a hearing and carry out all of the directives of the Idaho Supreme Court." R., No. 15000, p. 14. Defense counsel immediately filed post-remand motions which included:

(1) Motion (of March 16, 1983) to vacate and reset the sentencing hearing, based on the grounds that one and one-half days of actual preparatory time was insufficient.

(2) Motion (of March 16, 1983) to compel discovery of institutional (state penitentia-ry) jackets of Creech and the inmate who was killed by Creech.

(3) Motion (of March 16, 1983) to compel State's disclosure of witnesses (former prison inmates) who by supporting affidavit were alleged to possess knowledge relative to aggravating and mitigating circumstances.

When court convened at 9:15 a.m. on March 17, 1983, with Creech present, the district court proceeded to read aloud the written findings in aggravation and mitigation which he had previously entered, adding that "For the record, at the time I do affirm and reiterate these findings as of today." The court then took up the pending motions, including those above alluded to, and denied each and every one, and also denied objections to some of the previous and reiterated findings in aggravation. A further objection that a sentencing hearing under I.C. § 19–2516 required inquiry by live sworn testimony was also denied. Defense counsel requested and was granted permission to file with the court motions for jury sentencing and a motion for appointment of a designated medical examiner to evaluate Creech's ability to intelligently comprehend the proceedings. These motions were all denied. Of significance, in the process there was this exchange between defense counsel and the court:

"MR. KEHNE: If the Court reads the Supreme Court's order as authorizing the Court to do only as it already has done— in other words, read the findings and also read the sentence of death in open court—then I suppose there is no point in me having time to prepare a sentencing review.

"I had actual notice of this hearing Tuesday night, and that simply is not time for me to prepare a series of witnesses to come in and try to prove mitigating circumstances surrounding the crime.

"I think the Supreme Court's order leaves a little bit to be desired in the amount of direction it gives. On the one hand it sounds like it empowers the Court only to read the findings and the death

sentence in open court and follow the statutes on arraignment for sentence.

"On the other hand, the order authorizes the Court to impose any sentence which it feels to be just and appropriate under all the circumstances, which I would suggest gives us the authority to start from Square One and put on evidence and try to convince the Court to impose a sentence other than death.

"And if we are to have such hearing, I have to have more notice in advance to get people here in a day and a half.

"THE COURT: Thank you, Mr. Kehne.

"Mr. Bower, do you have any comments you would like to make in that regard?

"MR. BOWER: No.

"THE COURT: Very well. I am going to deny the motion. I will state why. The Idaho Supreme Court in my opinion has, by their statements, gone along with all the hearings I have had in regard to sentencing.

"I can't see that there is any more required in this particular proceeding other than an argument. I don't intend to let the witnesses all come back and al the presentence people brought in and go back clear through farther than that point before I made these findings.

"And I have also been given a deadline, I do note for the record, that I have to have this done. And I might add, this is about the only time I have. I have solid cases that should be heard between now and the deadline.

"So I am going to deny the motion to continue the motion vacating sentencing hearing and reset.

"MR. KEHNE: Just to clarify the record so I'm not charged with a waiver that I didn't intend, would the Court's ruling be the same if I secured from the Supreme Court an order extending the deadline?

"THE COURT: Oh, yes, I think we ought to get this matter going. I think it's up to the Supreme Court to control this matter. If you get an order, you are welcome to do so, Mr. Kehne, and I will abide by the same.

"MR. KEHNE: But as the order reads now, even if the Court had more time, the Court would rule that we are not to start all over again with witnesses?

"THE COURT: Well, not without cause. You haven't given me any cause. Tr., Vol. 4, pp. 22–25.

All motions being denied, the district court concluded the hearing of March 17, 1983, by again sentencing Creech to death.

### III.

As a natural by-product of the unprecedented manner in which this appeal has been processed, we now have pending before us yet a third appeal, which is relevant to that which I wrote in Part III of my opinion released in April of this year. There I mentioned Creech's letter to the district judge advising of his desire to enter a plea of guilty of the charge of first degree murder, and the alacrity with which he was ordered brought before the judge so he could do so. Effective assistance of counsel was rendered meaningless, but even so, counsel was not allowed to withdraw. At that point, and again at the resentencing under this Court's mandate, aid of counsel was useless to Creech. That is ground which has been well-ploughed. I mention it only in connection with Creech's change of mind and his motion to withdraw that guilty plea. Under the dual jurisdiction that this Court created, Creech made a supported motion in both this Court and the district court. This Court denied the motion as inappropriately made in an appellate court. Ordinarily this would be so had this Court not retained a jurisdiction apparently concurrent with the district court. Creech has since presented his motion in the district court, where it was denied, and now that will be before us on appeal when the briefs are in. This Court has indeed woven a tangled web. While it may be, as some say, that Thomas Creech should be helped along in his quest for self-destruction, it is a pity that the orderly administration of

criminal justice has broken down in the process.

### IV.

On the issue of lack of due process at a sentencing trial to determine whether a person will live or die, it surely must be the law that such a trial is as deserving of due process as the trial at which guilt or innocence is determined. I incorporate here the additional views which are set forth in my opinion in *State v. Sivak,* 105 Idaho 900, 396 P.2d 674, (1983) time constraints under the rules of the Court so dictating. Rather obviously, the majority in this case have now ignored two opportunities to explain away the fundamental error in destroying Creech's constitutional right to the *effective* assistance of counsel.